**Eugene M. WHITE, Appellant (Plaintiff),**

**v.**

**STATE of Wyoming; and Wyoming State Highway Department, Appellees (Defendants).**

**No. 88-291.**

Supreme Court of Wyoming.

Dec. 19, 1989.

Terry Mackey and Robert W. Tiedeken (argued), of Terry W. Mackey, P.C., Cheyenne, for appellant.

George Santini, Cheyenne, for amicus curiae Wyoming Trial Lawyers Ass'n.

Kenneth G. Vines of Vines, Gusea & White, Cheyenne, for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

CARDINE, Chief Justice.

Appellant, Eugene White, brought an action to recover damages for personal injury against the Wyoming Highway Department. The district court granted the Highway Department's summary judgment motion, holding that appellant's cause of action for the negligent maintenance of a highway was barred by W.S. 1–39–120. Appellant now challenges the constitutionality of that statute.

We affirm.

The Highway Department resurfaced Highway 212 in Crook County, Wyoming and painted a fresh centerline on the road. However, it neglected to repaint the white edge line which its resurfacing operations had obliterated. Prior to October 7, 1986, Highway Department crews returned to Highway 212 and sprayed a tar-like sealant along the shoulder of the road. On the evening of October 7, 1986, at approximately 10:00 p.m., appellant steered his tractor-trailer to the outside of the southbound lane to create more passing room for an approaching vehicle and, allegedly mistaking the dark colored sealant for pavement, ran off the road and jackknifed his truck. Appellant asserted that the Highway Department had been negligent in its maintenance of Highway 212 and in its operation of state-owned motor vehicles.

The Highway Department moved to dismiss, arguing that the facts alleged would not support an action for negligent operation of a motor vehicle, and that an action for negligent maintenance of a highway was barred by W.S. 1–39–120. After converting that motion to one for summary judgment, and after hearing appellant's constitutional challenge to § 1–39–120 of the Wyoming Governmental Claims Act, the district court granted the Highway Department's motion. Appellant now reasserts his contention that the State's immunity to suit under § 1–39–120 is contrary to the due process and equal protection guaranties of the Wyoming Constitution.

W.S. 1–39–120 provides:

"(a) The liability imposed by W.S. 1–39–105 through 1–39–112 does not include liability for damages caused by:

"(i) A defect in the plan or design of any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area;

"(ii) The failure to construct or reconstruct any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area; or

"(iii) The maintenance, including maintenance to compensate for weather conditions, of any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area."

Appellant has not advanced a federal constitutional challenge to this statutory grant of immunity, presumably due to the limited review afforded such challenges by the decision of the United States Supreme Court in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Appellant contends that the Wyoming Constitution places greater constraints on our legislature's power to immunize state and local government from tort actions and, therefore, relies upon state constitutional prohibition.

We have observed in this regard that the due process and equal protection guaranties of the federal Bill of Rights serve as a minimum standard for the protection of individual liberties and that the Wyoming Constitution may legitimately expand those safeguards. *Cheyenne Airport Board v. Rogers,* 707 P.2d 717, 726 (Wyo.1985); *Nehring v. Russell,* 582 P.2d 67, 77 (Wyo. 1978). We have, in fact, recognized such increased protection in a number of cases. For example, the more particularized and specific language of our constitution has led to the recognition of a fundamental interest in education which is wholly absent in federal constitutional jurisprudence. *Washakie County School District No. One v. Herschler,* 606 P.2d 310, 332–33 (Wyo.1980).

This court has also spoken of certain specific and detailed rights, which would

otherwise fall within the penumbra of federal equal protection guaranties, as if they had some constitutional stature independent of traditional equal protection analysis. *See Phillips v. ABC Builders, Inc.,* 611 P.2d 821, 831 (Wyo.1980) (statutory immunity from suit for builders and architects closes the courts to persons injured by the protected class, in violation of the specific equal protection right granted by Article 1, § 8 of the Wyoming Constitution). Much in the same vein, we have accorded special significance to the more particularized wording of our due process and equal protection provisions and have implicitly employed a more rigorous standard of scrutiny for statutes alleged to contravene those rights. *Nehring,* 582 P.2d at 77–80 (constitutional guaranty of "uniform operation of laws" requires guest statute to be substantially related to legislature's announced purpose, despite constitutionality under deferential federal standard of equal protection).

Effectively conceding the constitutionality of § 1–39–120 under federal due process and equal protection standards, appellant would have us find some substantive state constitutional protection of his right to sue the Highway Department. Furthermore, in reliance on *Nehring,* he would have us review § 1–39–120, allegedly in contravention of such constitutional protections, by a more stringent standard than traditional, "rational basis" scrutiny. We will do neither.

The constitutional right to substantive due process and equal protection under the law operates as a general guaranty that no individual's entitlement to either property or liberty can be taken by the State unless such action is at least rationally related to a concern for the welfare of all its people. Certain entitlements, however, are so significant that we require a more compelling justification for the State's interference with those rights. That is the case with an individual's interests in privacy and the association with his family. It is also the case with respect to his right to be free from discriminatory classifications based on race, color, or national origin. Those entitlements are so significant that the State's interference with those rights must be necessary to the accomplishment of a compelling interest.

Appellant does not contend that the Wyoming Constitution provides him with any unique protection of this magnitude. He does, however, contend that by specifically enumerating certain rights, which would otherwise be safeguarded by its more general due process and equal protection provisions, that document provides him with protection somehow beyond that afforded by normal due process and equal protection analysis. We cannot agree. In order to subject W.S. 1–39–120 to something more stringent than traditional "rational basis" scrutiny, we would have to find that the Wyoming Constitution either forbids such an enactment or grants appellant such a significant right as to demand a more penetrating intermediate level of scrutiny. As we will show in our following discussion of Article 1, § 8, the authority to immunize governmental entities from suit is not forbidden. To the contrary, it is, by the constitution, expressly granted to the legislature. Even if we were to adopt a three-tiered standard of scrutiny, an intermediate level of scrutiny would be inappropriate where, as in this case, the constitutional right granted to appellant was conditioned upon the reasonable exercise of legislative authority. None of the constitutional provisions cited by appellant warrant such scrutiny.

This court has largely adopted the two-tiered scrutiny employed by the federal courts in analyzing substantive due process and equal protection challenges. That is, where a statute affects a fundamental interest or creates an inherently suspect classification, the court must strictly scrutinize that statute to determine if it is necessary to achieve a compelling state interest. However, if the statute only affects ordinary interests in the economic and social welfare area, the court need only determine that it is rationally related to a legitimate state objective. *Troyer v. Department of Health and Social Services, Division of Vocational Rehabilitation,* 722 P.2d 158, 165 (Wyo.1986); *Cheyenne Airport Board,*

707 P.2d at 727; *Washakie County School District,* 606 P.2d at 333.

Appellant concedes that no fundamental interest or suspect classification is at issue here. Therefore, strict scrutiny is inappropriate and, were we to adhere to the two-tiered scrutiny analysis, W.S. 1-39-120 need only bear a reasonable relation to the legislature's legitimate interest in preserving the economic and social stability of the state. Such a standard is highly deferential to the constitutionality of the statute. That is, if any conceivable basis exists which will reasonably, although arguably, support the enactment, we will assume that the legislature has acted in a non-arbitrary and rational manner, and will hold the statute to be constitutional. *Hoem v. State,* 756 P.2d 780, 782-83 (Wyo.1988); *Cheyenne Airport Board,* 707 P.2d at 727; *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1355 (Wyo.1978). In order to avoid the probable result of such deference, appellant urges that we adopt an intermediate level of scrutiny as advanced in Justice Thomas' specially concurring opinion in *Hoem.* However, appellant's reliance on that opinion is misguided.

ARTICLE 1, § 8

At issue in *Hoem* was the constitutionality of the Wyoming Medical Review Panel Act, which required the screening of prospective medical malpractice suits. The plaintiff asserted that such screening violated her right to equal protection by impeding her access to the courts, contrary to Article 1, § 8 of the Wyoming Constitution. Justice Thomas noted the similarity between this section and a provision of Kansas' constitution discussed in *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058, 74 A.L.R.4th 1 (1987). He agreed with the analysis of that court that statutory constraints on such a specific equal protection right demanded greater justification than deferential, "rational" scrutiny. Thus, he suggested that this court, in such an instance, no longer presume that the legislature acted rationally but that it conduct a more penetrating examination and determine whether the contested classification actually and substantially furthered the asserted legislative goals. *Hoem,* 756 P.2d at 784-87 (Thomas, J., specially concurring, with whom Urbigkit, J., joins).

Such heightened scrutiny is reminiscent of the analysis of this court in *Nehring.* As noted above, that case dealt with a challenge to Wyoming's guest statute. We determined that the language of our constitution's equal protection provision, requiring "uniform operation" of laws, demanded that the statute bear a substantial relationship to its asserted purpose. While Article 1, § 8 was never expressly mentioned in that decision, it should be noted that the only constitutional issue in the case was whether the guest statute denied citizens uniform access to the remedial powers of the courts. *Nehring,* 582 P.2d at 78-79. Thus at bottom, both *Nehring* and Justice Thomas' concurrence in *Hoem* manifest the belief that our constitution provides a heightened equal protection guaranty of uniform access to judicial relief. We need not decide, however, whether that belief and the concomitant support for adoption of an intermediate level of scrutiny are presently shared by a majority of this court. The present case is clearly distinguishable from both prior decisions.

We have held that the requirement of Article 1, § 34, that all general laws operate uniformly, provides for equal protection equivalent to that provided by the Fourteenth Amendment to the Constitution of the United States. *Washakie County School District,* 606 P.2d at 332. We have also noted that the prohibition against special laws, contained in Article 3, § 27, is a more specific equal protection guaranty which enlarges the protections of Article 1, § 34. *Phillips,* 611 P.2d at 826. Appellant urges, in effect, that we adopt a similar analysis regarding Article 1, § 8. That is, he asserts that, while the general guaranty of equal protection demands that the legislature establish only arguably reasonable classifications, these more specific protections require some greater justification before the legislature may enact a special law or impede the people's access to the courts.

However, he neglects the limited nature of the right granted by Article 1, § 8.

That section provides:

"All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay. *Suits may be brought against the state in such manner* and in such courts *as the legislature may by law direct.*" (emphasis added)

We have long held that the second sentence of that section grants the legislature the power to determine the extent to which the State and its subdivisions are subject to suit. *Troyer,* 722 P.2d at 162–63; *Worthington v. State,* 598 P.2d 796, 800–04 (Wyo.1979); *Hjorth Royalty Co. v. Trustees of University of Wyoming,* 30 Wyo. 309, 222 P. 9 (1924). For us to hold otherwise would be tantamount to holding the constitution unconstitutional. It is noteworthy that the framers of the Wyoming Constitution did not include the grant of that power in Article 3 which generally sets out the powers, limitations on powers, and duties of the legislature. Rather, they chose to establish that power in the Declaration of Rights of Article 1. That power was established as a direct limitation on a right of the people, as declared in the first sentence of Article 1, § 8.

*Nehring* and *Hoem* dealt with an individual's right to have access to the courts with respect to relief sought from another person. Appellant, however, seeks such access to bring suit against the State of Wyoming. Article 1, § 8 clearly gives no unconditional right to sue the State. Because the specific expansion of substantive due process and equal protection arguably granted by Article 1, § 8 does not exist with respect to suits against the State, legislative decisions concerning the retention or abrogation of governmental immunity to suit are only subject to the reasonableness standard of Article 1, § 34. Thus, appellant cannot rely on the rationale of *Nehring* and the concurrence in *Hoem* to obtain a heightened level of scrutiny.

## OTHER CONSTITUTIONAL PROVISIONS

Other provisions of the Wyoming Constitution on which appellant relies similarly constrain legislative action only to the extent that it is unreasonable. None of those provisions warrants resort to an intermediate level of scrutiny to determine the legitimacy of W.S. 1–39–120. Those provisions state, in pertinent part:

Article 1, § 2:

"In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal."

Section 3:

"Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction."

Section 6:

"No person shall be deprived of life, liberty or property without due process of law."

Section 7:

"Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

Section 34:

"All laws of a general nature shall have a uniform operation."

Article 3, § 27:

"The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * for limitation of civil actions; * * * granting to any corporation, association or individual * * * any special or exclusive privilege, immunity or franchise * * *. In all other cases where a general law can be made applicable no special law shall be enacted."

Article 10, § 4:

"No law shall be enacted limiting the amount of damages to be recovered for causing the injury or death of any person."

■ We have held that the personal and political rights secured by the equal protection provisions of Article 1, §§ 2 and 3, are not absolute, and that those sections do not preclude the legislature from imposing reasonable restrictions on such rights in the public interest. *Haskins v. State ex rel. Harrington,* 516 P.2d 1171, 1173–74, 70 A.L.R.3d 1171 (Wyo.1973). Similarly, we have held that legislative restrictions on those rights satisfy our constitutional standard of substantive due process unless they are unreasonable and arbitrary. *Cheyenne Airport Board,* 707 P.2d at 726–27. Thus, a statute which would be deemed constitutional under the "reasonableness" standard of the Fourteenth Amendment to the United States Constitution also complies with the requirements of Article 1, § 6. *State v. Laude,* 654 P.2d 1223, 1228 (Wyo.1982).

■ We reach the same result when analyzing such a statute according to the standard of Article 1, § 7, for much of the substantive content of § 6 is derived from the language of § 7. *See generally State v. Langley,* 53 Wyo. 332, 84 P.2d 767, 770–71 (1938) (the separate inclusion of both § 6 and § 7 in our constitution represented the framers' understanding that the concept of due process consisted not only of the historically accepted procedural element evident on the face of § 6, but also entailed restraints on the passage of substantive laws such that the majority could exercise its will against an individual only to the extent that such an exercise was reasonable and not arbitrary); *Weaver v. Public Service Commission,* 40 Wyo. 462, 278 P. 542, 547–48 (1929) (Article 1, §§ 2 and 7 and the general nature of the police power provided in the content of Article 1, § 6, require legislative actions to be reasonable, to operate with equality, and to be in the service of the public's welfare).

Appellant's reliance on Article 1, § 34 and Article 3, § 27 is also unfounded. We have held that these complementary provisions do not proscribe reasonable classifications; that they only require a statute to operate in a similar manner upon all persons in the same circumstances. *Meyer v. Kendig,* 641 P.2d 1235, 1240 (Wyo.1982); *Mountain Fuel Supply,* 578 P.2d at 1356; *May v. City of Laramie,* 58 Wyo. 240, 131 P.2d 300, 305–06 (1942). Furthermore, it is obvious that appellant's reliance on these provisions is nothing more than a restatement of his equal protection argument, for he does not argue that the contested statute constitutes a prohibited special law. He merely argues that, as a general law, it must operate uniformly. Therefore, our only concern under these provisions is whether any classification accomplished by the statute was reasonably related to a legitimate legislative goal. *Id.*

Finally, appellant asserts that W.S. 1–39–120, by denying his cause of action, amounts to a limitation on damages in contravention of Article 10, § 4 of the Wyoming Constitution. We expressly rejected this general argument in *Meyer,* 641 P.2d at 1239. Additionally, speaking specifically of the Governmental Claims Act, we have held that "Art. 10, § 4 may prevent the legislature from imposing arbitrary limits on damages, but it does not prevent limitations on the types of actions which may be brought against the State." *Troyer,* 722 P.2d at 163. Thus, this provision is inapplicable to the present case.

■ Appellant, therefore, has cited no provision of the Wyoming Constitution which provides him with protections independent of substantive due process and equal protection analysis. Neither has he established that he is entitled to anything more than traditional rational scrutiny of § 1–39–120.

## RATIONAL RELATION TO LEGISLATIVE PURPOSE

■ Although appellant expends much energy disputing the appropriate standard of review of this contested statute, he asserts that he must prevail, in any event, even upon the application of the deferential "reasonableness" standard of scrutiny.

We disagree. Against his largely conclusory argument in this regard, the history of the Governmental Claims Act and the history of our legislature's response to the much ballyhooed "tort/insurance crisis," reveals a clearly reasonable effort to serve the public interest. That particular plaintiffs may occasionally be less well served as a result of these efforts, cannot be denied. However, neither can we deny that, in so doing, the legislature has also attempted to ensure the viability of an insurance system that funds most tort compensation and has attempted to ensure that the State's prospective liability would not jeopardize its ability to provide much needed public services.

The history of the legislature's actions in the specific area of governmental immunity is marked by a continual dialogue with the decisions of this court. In *Collins v. Memorial Hospital of Sheridan County,* 521 P.2d 1339 (Wyo.1974), we held that such immunity was waived to the extent that a governmental entity used public funds to insure itself against liability. Although we did not speak directly to the general issue of immunity, we noted that its application had fallen into wide and laudable disrepute and commented specifically upon the inequities of Wyoming's rather piecemeal approach to the problem. *Id.* at 1340–43. At the following legislative session, our holding in Collins was enacted into law by 1975 Wyo.Sess.Laws, ch. 197, § 1, accompanied both by a requirement that the state purchase liability insurance for all law enforcement officers and by a broad authorization for the purchase of liability insurance for health care providers. *Id.;* 1975 Wyo.Sess. Laws, ch. 16, § 1. Thus, the legislature left the question of immunity largely to the discretion of individual governmental entities, providing for the option of waiver by authorizing the purchase of insurance and selectively waiving state immunity by requiring specific activities to be covered by insurance.

Such a treatment of the problem, however, fell under the criticism of Justice Rose's impassioned dicta in *Jivelekas v. City of Worland,* 546 P.2d 419, 425 (Wyo. 1976), calling for a broad abrogation of immunity for all governmental subdivisions. Admittedly, *Collins* left much to be desired. In retrospect, it was in fact a mere stopgap based on our trust that governmental entities would continue to insure against liability and on our trust that the legislature would take more comprehensive and satisfactory measures to resolve the problem.

This court's disenchantment with the doctrine of governmental immunity, along with the pressures to judicially abrogate the doctrine, had been held in check largely by our deference to the legislature's proper role in determining such issues. Indeed, in *Jivelekas* Justice Raper clearly noted the legislature's obligation to fund both tort liability and the many services demanded by our citizens and cautioned that the legislature be given time to weigh its difficult economic choices and devise a uniform system for handling tort liability. *Id.* at 433–34 (Raper, J., concurring in part and dissenting in part). Unfortunately, circumstances arose that would no longer permit such complete deference.

That is not to say that the criticisms in *Jivelekas* went unheeded. In 1977, the Forty-fourth Legislature enacted House Bill 186, which, like the present Governmental Claims Act, provided for a broad yet limited waiver of immunity to tort suits and articulated a policy of balancing the State's responsibility to tort victims against its many other fiscal responsibilities. That act, however, was defeated by gubernatorial veto. 1977 Digest of House Journals 231–33. With the defeat of that act, all governmental entities retained immunity except to the extent, as per *Collins,* they had insured themselves against liability. We were then called upon to decide *Oroz v. Board of County Commissioners of Carbon County,* 575 P.2d 1155 (Wyo.1978) and *Worthington v. State,* 598 P.2d 796 (Wyo. 1979). In both cases, a victim of alleged governmental negligence squarely challenged the immunity of an uninsured governmental entity.

In *Oroz,* we abrogated the immunity of local governments to tort actions, grounding our authority to do so upon the deter-

mination that the immunity of such entities was a court created doctrine that we were freely empowered to amend or overrule. In *Worthington,* however, we declined to similarly abrogate the immunity of the State. We noted in that case that Article 1, § 8, of the Wyoming Constitution "left to the legislature to determine what areas and under what conditions it would consent to suit for damages suffered by an individual and under which a recovery might be had by an individual for the wrongs of the State." *Worthington,* 598 P.2d at 803. Noting also the legislature's recent attempts to provide an orderly cure for the unfairness inherent in the immunity doctrine, we found it appropriate to defer to those efforts and refrain from interfering with the legislative prerogative. *Id.* at 803–04.

Those efforts, during the interim between *Oroz* and *Worthington,* culminated in the passage of a comprehensive Governmental Claims Act. The concerns which the legislature attempted to balance through that act are best expressed in W.S. 1–39–102, which states in part:

> "The Wyoming legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of governmental immunity and is cognizant of the Wyoming Supreme Court decision of *Oroz v. Board of County Commissioners* 575 P.2d 1155 (1978). It is further recognized that the state and its political subdivisions as trustees of public revenues are constituted to serve the inhabitants of the state of Wyoming and furnish certain services not available through private parties and, in the case of the state, state revenues may only be expended upon legislative appropriation. This act is adopted by the legislature to balance the respective equities between persons injured by governmental actions and the taxpayers of the state of Wyoming whose revenues are utilized by governmental entities on behalf of those taxpayers."

In the service of this purpose, the act set out the limits of governmental liability and established claim procedures. However, it also required the State to purchase insurance to cover its liability, provided for periodic review of the State's claim history under that coverage, and required the State to conduct actuarial and risk management studies. 1979 Wyo.Sess.Laws, ch. 157, §§ 1, 7. Additionally, as a safeguard against unwarranted claims, the act from its inception has sharply restricted the ability of governmental entities to settle claims without an investigation and a determination that the claimant was entitled to relief. *See* W.S. 1–39–115 and its attendant history. Thus the act, in its waiver of immunity, has relied heavily on the maintenance of insurance and has sought to control the costs of that insurance both through the prevention of risks and the litigation of baseless claims.

These management techniques, however, gradually became inadequate to the task of providing affordable insurance funding for the State's potential tort liabilities. By the time the Forty-eighth Legislative Session convened in 1986, the State had been impacted by the so-called "tort/insurance crisis," then sweeping this nation. Governor Herschler, in his address to both houses of the legislature, noted the inability of both government and the private sector to maintain affordable insurance coverage against potential tort liability. The governor urged the legislature to consider permanent measures which might make the extent of such liability more predictable and specifically called for a variety of interim actions which would address problems created by the Governmental Claims Act. Among such suggestions were the elimination of liability related to the construction and maintenance of highways and the creation of governmental self-insurance funds. 1986 Digest of House Journals 7–10. The legislature answered this call on a variety of fronts.

In addition to measures directed specifically towards governmental tort liability, the Forty-eighth Legislature enacted a number of "tort reforms" designed to expedite litigation and, by either limiting liability exposure or making it more predictable, make certain risks more insurable. Among the reforms enacted into the 1986 Wyo-

ming Session Laws are the following: ch. 4 (providing for sanctions against the submittal of baseless pleadings); ch. 5 (providing for the dismissal of actions on the basis of a defendant's affidavit of non-involvement, providing that such an affidavit may be filed in lieu of an answer, and permitting a plaintiff limited discovery for the purpose of rebutting that affidavit); ch. 24 (repealing joint and several liability); ch. 45 (clarifying the burden of proof and standard of care to be established in medical malpractice cases); ch. 48 (limiting liability for amateur rodeos sponsored by public schools and non-profit organizations); ch. 92 (requiring the screening of medical malpractice claims prior to filing suit); and ch. 100 (eliminating liability for the executive decisions of governmental agencies and non-profit corporations).

More specifically directed at the problem of governmental liability, 1986 Wyoming Session Laws, chs. 74 and 81, established a program of self-insurance for the State and made participation in that program available to local governmental entities. The intent of the legislature with respect to that program is articulated in W.S. 1-41-101, which provides:

> "The legislature recognizes that certain liability insurance policies of the state of Wyoming have been cancelled, that no responsive bids have been received and that there exists a need to develop a method to handle claims brought under the Wyoming Governmental Claims Act and arising under federal law. The legislature declares that the appropriate remedy is to create an account for self-insurance of the state and to provide for a loss prevention program. It is the intent of the legislature that the self-insurance account shall be operated on an actuarially sound basis. The legislature further declares that its intent is that the availability of commercial liability insurance coverage shall be explored considering the possibility that the insurance industry can provide coverage in the future that is less expensive than the costs of providing a loss prevention program and paying for claims out of the self-insurance account."

Consistent with the expressed intent that this fund function merely as an interim alternative to the purchase of commercial insurance, the legislature provided for the automatic repeal of the self-insurance program, effective June 30, 1988. However, the continued unavailability of insurance required the extension of the program until June 30, 1990. 1988 Wyo.Sess.Laws, chs. 19, 63.

Finally, and most pertinent to the present case, the legislature also responded to Governor Herschler's address by eliminating governmental liability for defects in the design, construction and maintenance of streets and highways. 1986 Wyo.Sess. Laws, ch. 89. We note in this regard the governor's opinion in that address that such a reinstatement of immunity would not preclude the legislature from later waiving immunity for specific claimants whose injuries were allegedly caused by the negligent maintenance of highways. It is not certain that this opinion played any part in the legislature's final decision. It certainly is not relevant to any issue raised or to our decision in this case.

We do observe, however, that the contents of the governor's address, when read in conjunction with the contents of this appellate record and considering the specific areas of tort law which the legislature considered ripe for reform, amply reveal the reasonableness in the legislature's reinstatement of immunity with respect to highway maintenance. The record reveals, concerning the period between the passage of the Governmental Claims Act and the 1986 legislative session, the following noteworthy items:

1. The majority of claims filed against the State (75%–90%) related to the design, construction and maintenance of the State's highway system.

2. In addition to purchasing insurance, the legislature appropriated $750,000 to the Attorney General's office to pay claims under the Claims Act, one-third of which was set aside to cover litigation fees and expenses.

3. During that period, and as of July 21, 1988, the Highway Department defended

eighty-six lawsuits, claiming a total of $100,333,158.22 in damages. Seventy of those suits resulted in awards or settlements totalling $1,654,485.22. Sixteen of the suits were still pending, exposing the State to a potential liability of $9,398,-203.67.

4. During that same period, the Highway Department handled an additional thirty-five claims for a total of $7,864,-051.80 that did not result in a lawsuit. Two were pending, in a total amount of $23,210.92. The other claims resulted in a total payment of $10,000.

5. Of the one hundred three claims that had been finalized, fifty-eight claimants received nothing.

While the sheer expanse of our state's highway system might to some extent account for the disproportionate amount of claims relating to this one area of governmental activity, the fact that the State has avoided liability on so many of those claims suggests a different conclusion. When one considers that joint and several liability still existed during this period and that under this doctrine the State, though one percent negligent, might be required to pay a total judgment, we think it not unreasonable for the legislature to assume that, in many of these cases, the State had merely become a convenient deep pocket.

We are all too aware that a highway accident may cause damages costing far in excess of what the injured and their insurance policies are capable of paying. Under the original provisions of the Governmental Claims Act, however, an often faultless Highway Department was hauled into court and held answerable for all of the claimed loss. While the record shows that the State was able to avoid liability in a great number of instances, the costs to the taxpayer of such vulnerability cannot be tallied merely by reference to the cases successfully defended by the State. The monetary costs of litigation and the related costs of diverting the human resources of government from otherwise beneficial endeavors must also be calculated. It is not unreasonable for the legislature to determine that these costs outweigh the benefits of continued liability for highway maintenance. We cannot say it is unreasonable for the legislature to decide that the most efficient use of public monies requires assertion of immunity in these circumstances.

We hold, therefore, that the passage of W.S. 1-39-120, providing immunity from suit for design, construction and maintenance of highways, bears a reasonable relation to the legitimate legislative objectives of conserving public funds and preserving a fair and viable system of compensating persons injured by governmental actions. There is no constitutional infirmity in that statute.

Affirmed.

URBIGKIT, Justice, dissenting.

The people of Wyoming should understand what this decision could someday give them. If the day comes when a school bus loaded with young Wyoming students is hit by a careless snowplow operator and many of those children are killed or injured so badly that they will need medical attention for the rest of their lives, the state may be permitted to deny any remedy to those injured.[1] I would refuse to permit the injured students or their parents to be locked out at the courthouse door.

Abraham Lincoln, fighting more battles than simply slavery and secession, said:

> "It is as much the duty of Government to render prompt justice against itself in favor of citizens as it is to administer the same between private individuals. The investigation and adjudication of claims in their nature belong to the judicial department." [2]

1. Compare W.S. 1-39-105, motor vehicle liability, with W.S. 1-39-120(a)(iii), exclusion for weather maintenance of highways, and then interject W.S. 1-39-118(b), providing for liability to limit insurance "covering any acts or risks." Is safety as important today as it was before fiscal responsibility for damage was removed? Consider for example, two-way construction barricading for repair sites on the interstate. It is axiomatic that responsibility promotes attention to safety.

2. Minge, *Governmental Immunity From Damage Actions in Wyoming,* VII Land & Water L.Rev. 229, 229 (1972) (quoting *First Annual Message to*

This majority claims the governmental immunity statute recently passed by the Wyoming legislature does not violate the Wyoming citizen's rights to equal protection, due process or access to the courts. For the reasons which follow and form the basis of my dissent, I believe the majority is gravely mistaken.

## I. INTRODUCTION

The majority speaks of an "individual's entitlement" to property or liberty when locating the functions assigned to our constitutional assurances to due process and equal protection of the laws. That language alone telegraphs the outcome before it arrives at the conclusion. When rights to equal protection of the laws, due process, access to courts and the prohibition against special legislation, designed to foreclose any decision by a jury to set the remedy, are recharacterized as "entitlements," the result is automatic. That the government can do no legal wrong appears to be common sense under the old jurisprudential notion that one simply has no right to "entitlements."

I see the interest to liberty or property as a right, not some "entitlement" bestowed upon the citizen by the government. Many have argued throughout history that government was instituted to secure the rights of the people.[3] I am among those who agree. In doing so, I understand such rights to be prior to government, not gifts from government, and therefore not properly characterized as "entitlements."

The State of Wyoming was not in the vanguard in progression to answer the anachronism of sovereign and governmental immunity;[4] but with its current legislation buttressed by this decision, Wyoming achieves a position at the point of near solitary regression. Compare *Jivelekas v. City of Worland,* 546 P.2d 419 (Wyo.1976); *Davis v. Board of County Com'rs of Carbon County,* 495 P.2d 21 (1972), *overruled sub nom. Collins v. Memorial Hospital of Sheridan County,* 521 P.2d 1339 (Wyo. 1974); *Maffei v. Incorporated Town of Kemmerer,* 80 Wyo. 33, 338 P.2d 808, *reh'g denied* 80 Wyo. 33, 340 P.2d 759 (1959), *overruled sub nom. Collins v. Memorial Hospital of Sheridan County,* 521 P.2d 1339 (Wyo.1974); *Price v. State Highway Commission,* 62 Wyo. 385, 167 P.2d 309 (1946); and *Evans v. Board of County Com'rs of El Paso County,* 174 Colo. 97, 482 P.2d 968 (1971); with *State v. Stovall,* 648 P.2d 543 (Wyo.1982); *Oroz v. Board of County Com'rs of Carbon County,* 575 P.2d 1155 (Wyo.1978); and *South Cheyenne Water and Sewer Dist. v. Stundon,* 483 P.2d 240 (Wyo.1971).

In broad thesis for dissent as the majority directly displaces the progression and optimism of *Stovall,* 648 P.2d 543; *Oroz,* 575 P.2d 1155; and *Jivelekas,* 546 P.2d 419, I dissent for three reasons: (1) governmental and sovereign immunity in broad categories are anachronisms and particularly so where as now either first created or recently restored and cannot fit within the basic principles of constitutional government; (2) the wrong standard of review is used to permit the legislature to deny a remedy for wrongful injury or death; and (3) 1986 Wyo.Sess.Laws ch. 89 (Chapter 89) should fail even under the loosest standard of review—the rational relationship test. Its invidiously discriminatory classifications, designed to withhold remedies for injury caused by government, cannot be justified constitutionally.

The issue in this case is simple. Should the victims bear the financial burdens of governmental wrongdoing or should the government? Economic convenience is no

*Congress,* 7 Richardson, Messages and Papers of the Presidents 3245, 3252 (1897)).

3. The Declaration of Independence para. 2 (U.S. 1776).

4. See for example, Leflar and Kantrowitz, *Tort Liability of the States,* 29 N.Y.U.L.Rev. 1363, 1407 (1954), with the classification of "Responsibility Almost Never Undertaken" including Wyoming and only seven other states; Van Alstyne, *Governmental Tort Liability: A Decade of Change,* 1966 U.Ill.L.F. 919 (1966); Comment, *The State as a Party Defendant: Abrogation of Sovereign Immunity in Tort in Maryland,* 36 Md.L.Rev. 653 (1977); Note, *Administration of Claims Against the Sovereign—A Survey of State Techniques,* 68 Harv.L.Rev. 506 (1955).

constitutional license to deny a remedy or justice to the injured.

More fundamental to jurisprudence than governmental immunity is the notion that the law suffers no wrong without a remedy. It cannot be countenanced philosophically or constitutionally that the broken body or destroyed life is no legal wrong when caused by a governmental employee. I dissent because Chapter 89 and approving majority opinion: (1) violates basic principles of American justice; (2) ignores and offends Wyoming's constitutional guarantees of rights for the wrongfully injured; and (3) retreats to an outdated and rejected standard for constitutional validation of fundamental rights for body and life. The construction of Chapter 89 given by the majority makes this Wyoming judiciary the protector of property against an involuntary taking, but not the protector of a person's body or life against a negligent maiming or killing. This to me is incredible.

The utter lack of justification for immunity was articulately expressed by Justice Robert R. Rose, Jr. in *Jivelekas,* 546 P.2d at 429–31 and again in special concurrence in *Oroz,* 575 P.2d at 1161:

> Furthermore, as explained in *Jivelekas, supra,* 429–431, Article 1, § 8, Wyoming Constitution, should not prevent such a total abrogation in light of the thrust of that provision and the decisions of this court which have touched and concerned its applicability. Notwithstanding the failure of the majority to speak to the abrogation of the State's immunity in this decision, I am confident that, even if the opinion's scope is not broad enough to include the State, nevertheless, the curtain is slowly but surely falling on this illogical and inexcusable chapter of legal history in Wyoming. Whether the final lines of this tragic drama will be read and acted upon by this court or by the legislature remains to be seen, but in fairness to those who are hurt by the agents of the State but may still be left without a remedy, the day of their relief cannot be far away.

My life long battle against the injustice which comes with decoupling liability from negligence began in litigation—*Davis,* 495 P.2d 21 and *Awe v. University of Wyoming,* 534 P.2d 97 (Wyo.1975); continued in the legislature until the enactment of the state governmental claims act, W.S. 1–39–101 through 1–39–120, *see Stovall,* 648 P.2d 543; and now to appellate adjudication. The observable affront of injustice does not change with the perspective. With such total disagreement with the majority, it is necessary to expressively discern the scope and constitutional complexities of W.S. 1–39–120 as packaged into the state torts claim act by House Bill No. 44, Chapter 89, the so-called tort crisis of the mid-decade.[5]

## II. STATISM. THE ISSUE IS ADJUDICATION FOR A POLITICAL PHILOSOPHY

The encircling issue is statism—the imperial majesty of the central authority within which responsibility for its actions through agents of that crown are not to answer for damage and injury to its citizens.[6] The

5. Perhaps 100 well-considered recent law journal reviews have been written on the subject of the tort crisis, but the only generally validated conclusion is that the crisis as sponsored by economic interests was more psychological than rational and none of the "cures" have altered the increase of insurance rates except where rights for innocent victims have been eliminated to reduce direct claim payments, but even then, the reduction in rate has not been proportional to the amount denied by the elimination of rights of citizens to recover for injuries sustained, e.g., Priest, *The Current Insurance Crisis and Modern Tort Law,* 96 Yale L.J. 1521 (1987).

6. *See* Amar, *Of Sovereignty and Federalism,* 96 Yale L.J. 1425 (1987). "Victims of government-sponsored lawlessness have come to dread the word 'federalism.' * * * Simply put, governments have neither 'sovereignty' nor 'immunity' to violate the Constitution[s]." *Id.* at 1425–27.

> It therefore seems evident that at least in some cases, blanket government immunity from liability conflicts with the Constitution's structural principle of full remedies for violations of legal rights against government. What, then, can possibly justify the invocation of sovereign immunity in those cases? Surely not the text of the Constitution, for we have already seen that governmental claims to sovereign immunity have no textual basis.

further concern is my distaste for any constitutional construction now advanced in result by the majority which only protects sanctity of property, but not body or life. These conflicts are as old as the societies and not accurately confined within dogmas that the king can do no wrong. It encompasses a fundamental political conflict between those directed towards the ephemeral power of government and the eternal right of property as contrasted with more modernized ideas of rights of the individual to life and liberty as a territorial imperative for ego and self to be defended against a two-pronged invasion by property priority and the all-dominating government. Pragmatically confined paradigms in cost-benefit criteria to deny safety and inflict loss on the injured hardly fit into constitutional responsibility of government for access to justice and equal protection for redress from injury.

Governmental and sovereign immunity become manipulated symbols to justify predictable results desired by preconceived economic and societalistic persuasions. The wail to protect the state from jury overcompensation to the injured reached its crescendo atop the legislative and judicial failure to correct the admitted inequities in the failure of justice.

In recent times, this court has been called to enforce the state constitution in significant regard four times and has not previously flinched. It is unfortunate that this majority does so now when the legislature says the state is not responsible when government agents negligently or carelessly cause injury or death.[7]

The judicial notion of governmental and sovereign immunities is found in *Russell v. Men of Devon,* 2 Term Rep. 671, 100 Eng. Rep. 359 (1788). The current apologists who continue to argue for governmental and sovereign immunities despite the openly admitted injustices should perhaps note that *Men of Devon* was overruled in England in 1890. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv.L.Rev. 1 (1963); Reeves, *Leviathan Bound—Sovereign Immunity in a Modern World,* 43 Va.L.Rev. 529 (1957). Sovereign immunity as a declaration of the authority of the state differs from governmental immunity as given to local units of government in both justification and composition. Likewise, historical differentiations are found between governmental and proprietary functions and somewhat offset are the distinguishable discretionary and ministerial activities and the more logical and realistic comparisons and separations of the planning activity from the maintenance and preservation governmental function. Recognition is also required of the difference between sovereign immunity as immunity for the state, while liability of state employees cannot be accorded an identical insulation or absolution constitutionally. *University of Louisville v. O'Bannon,* 770 S.W.2d 215 (Ky.1989).

*Id.* at 1489. *See also* Jackson, *The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity,* 98 Yale L.J. 1 (1988).

> *Marbury v. Madison* [5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)] proclaimed that the essence of civil liberty, of a government of laws and not of men, was the availability of a judicial remedy for governmental wrongdoing that invaded private legal rights. Against the force of this principle stood a common law tradition of sovereign immunity, a tradition of English law misunderstood in its transposition to the United States, but reinforced by early political battles of the young republic.

*Id.* at 126. *Cf.* Duffy, *Sovereign Immunity, The Officer Suit Fiction, and Entitlement Benefits,* 56 U.Chi.L.Rev. 295 (1989) and Massey, *State Sovereignty and the Tenth and Eleventh Amendments,* 56 Chi.L.Rev. 61 (1989).

7. *Hoem v. State,* 756 P.2d 780 (Wyo.1988); *Rocky Mountain Oil and Gas Ass'n v. State,* 749 P.2d 221 (Wyo.1987); *Washakie County School Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied sub nom. Hot Springs County School District Number 1 v. Washakie County School District Number 1,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Witzenburger v. State ex rel. Wyoming Community Development Authority,* 575 P.2d 1100, *reh'g denied* 577 P.2d 1386 (Wyo.1978). Comparably immersed in shame was the denial of required legislative reapportionment, *State ex rel. Whitehead v. Gage,* 377 P.2d 299 (Wyo.1963); Note, *Wyoming Legislative Reapportionment in the Light (?) of Baker v. Carr,* 18 Wyo.L.J. 23 (1963). *See Cranston v. Thomson,* 530 P.2d 726 (Wyo.1975); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); and *Schaefer v. Thomson,* 240 F.Supp. 247 (D.Wyo.1964). *See also Harris v. Shanahan,* 192 Kan. 183, 387 P.2d 771 (1963).

The court in *O'Bannon* justified a reinstated *sovereign immunity* to the university, but held that the extension to the medical facility would involve unconstitutionally impermissible absolution of existing common law rights of action for personal injury. *Kaisner v. Kolb*, 543 So.2d 732 (Fla.1989) and Comment, *The Role of the Courts in Abolishing Governmental Immunity*, 1964 Duke L.J. 888 (1964). The importance derived from the broad application of Chapter 89 comes in part from the fact that Wyoming has never before had a comparably broad scope of immunity within the Wyoming justice delivery tort system. This is not only a new but a great day for injustice. No less than reapportionment, this denial of citizen's rights is singularly regrettable.

III. HISTORY OF WYOMING LAW

The Wyoming Constitution makes clear that government is not an end in itself—it is derivative in rightful existence as founded upon the power of the people and extended in structure only with constitutional authorization and justification.

> All power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper.

Wyo. Const. art. 1, § 1.

This majority result, which constitutionalizes the denial of a remedy for a wrong only at the hands of the state, can hardly be said to follow inevitably from the labyrinth of Wyoming governmental and sovereign immunity case law. I am astounded how deaf the judicial ear can be to a victim's cries for justice.

In *Ricketts v. Crewdson*, 13 Wyo. 284, 79 P. 1042 (1905), this court originally recognized the exercise of discretion in tax assessment to be absolved from judicial review where *only arbitrary or dishonest conduct* could raise litigable issues. Thereafter, in *Opitz v. Town of City of Newcastle*, 35 Wyo. 358, 249 P. 799 (1926) (now superceded apparently by this present legislation), liability was approved for failure in use by the city of reasonable care to keep the streets safe for public travel. In *Weaver v. Public Service Commission of Wyoming*, 40 Wyo. 462, 479, 278 P. 542 (1929), Chief Justice Blume recited:

> But the state does not own the highways in that capacity; these exist, or at least are maintained, solely by reason of the taxes paid, and contributions made, by private individuals and corporations, including private carriers. Highways exist for the benefit of the members of the public at large, and the only right which the state has to regulate or prohibit their use must be sought in the police power of the state to promote the safety, peace and general welfare of the people.

The critical question in conceptualizing this thesis of Chief Justice Blume in *Weaver* is whether the obligation of the state accords a compensable responsibility for its failure of performance. Case history then follows with the Utah Construction Company cases as questioning obligation to pay for the construction required. *Utah Const. Co. v. State Highway Commission*, 45 Wyo. 403, 19 P.2d 951 (1933) and *State Highway Commission v. Utah Const. Co.*, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929). Compare in more modern review, *State Highway Com'n of Wyoming v. Brasel & Sims Const. Co., Inc.*, 688 P.2d 871 (Wyo. 1984) and *Brasel & Sims Const. Co., Inc. v. State Highway Com'n of Wyoming*, 655 P.2d 265 (Wyo.1982).

The depression years in Wyoming and the pervasive fair trade legislation which was generally then enacted called Chief Justice Blume, in *State v. Langley*, 53 Wyo. 332, 84 P.2d 767 (1938), to again analyze the foundations of our society and the basis of our judicial responsibility. The anxiety today circulating about the so-called insurance crisis cannot be compared to the level of trouble enveloping everyone during the depression years. The Wyoming justices of that era did not allow that heavy anxiety to detract their navigational fix on the constitution.

Nearly every law abridges individual freedom of action to a more or less extent. In nearly all instances when one is enacted, it gives rise, or may give rise, to a conflict between such freedom on the one hand, and the power of the legislature to abridge it on the other. The solution of the conflict is judicial in its nature. Courts must be, and are, whether willingly or not, the ultimate arbiters as to whether or not there is, in a particular case, an unwarranted invasion of the guaranteed rights above mentioned. 11 Am.Jur. 1087. They have found that solution,—the only one possible or just under the circumstances—in the standard of reasonableness. 6 R.C.L. 236; 11 Am. Jur. 1073–1074. That standard is indefinite. What is reasonable depends on the facts and circumstances. 11 Am.Jur. 1074; 6 R.C.L. 236, 239; 19 R.C.L. 807. Paine's thought that, as civilization progresses, men will more and more regulate their own affairs has not proved itself correct. Altruism has not proceeded that far. History is replete with the wreckage of rules of private law. It would be no less than surprising, if it were otherwise in the field of public law. As the number of people increases, as trade develops, as civic centers become crowded, as society becomes more complex, more and more problems arise which must be solved, and the freedom of movement and of action of the individuals must be harmonized with equal rights for all. This is not always easy to do. Certain rules have been laid down to help.

In order that a statute may be valid, the purpose, aim, or end thereof must be within the scope of purview of the police power, and in furtherance thereof; the means adopted must be reasonable and not arbitrary, and must be appropriate for the accomplishment of the end in view; in other words, there must be a substantial connection between the purpose in view and the actual provisions of the law.

*Id.* at 343–44, 84 P.2d 767.

In a carefully constructed analysis, this court in *Ramirez v. City of Cheyenne*, 34 Wyo. 67, 241 P. 710 (1925) determined that the City of Cheyenne could be responsible in a damage award for the negligent maintenance of a swing in the public park.

This court observed:

[M]ost of the courts of this country, on one ground or another, have held cities liable for negligence in failing to keep their streets in a safe condition for travel. While such liability is sometimes declared by statute, it is often imposed in the absence of statute, and in the latter class of cases the right to damages is usually sustained as an exception to the general rule that exempts the city from liability for negligence in the performance of governmental or public duties.

*Id.* at 78, 241 P. 710.

Following *Opitz* and *Ramirez*, this court again considered municipal liability in *Wilson v. City of Laramie*, 65 Wyo. 234, 199 P.2d 119 (1948), where a Caterpillar tractor used in performing a "governmental function" of lowering a street grade got loose and rolled down the hill causing injury.

That the unfortunate accidents to the children involved in this case are to be deplored goes without saying. That there is a great deal of merit in the contention that immunity from liability for negligence on the part of governments and governmental agencies should be abolished cannot be questioned. But whether the courts should do so on their own motion is a matter of grave doubt.

*Id.* at 249, 199 P.2d 119.

This case establishes immunity for equipment constructing roads where immunity for the roads and their usage did not exist. Adding to Wyoming's law on immunities is *Merrill v. Bishop*, 69 Wyo. 45, 237 P.2d 186 (1951), where action against the constitutional state water commissioner and other state water officials was not an action against the state but only a maintainable action based on the tort of the officials themselves.

But in *Ellis v. Wyoming Game & Fish Commission*, 74 Wyo. 226, 286 P.2d 597 (1955), the action against the Governor and other state officials for damages during

the seizure of beaver pelts was determined to be an action against the state in a governmental function and, lacking approval of the state, could not be maintained. *See likewise Hjorth Royalty Co. v. Trustees of University of Wyoming*, 30 Wyo. 309, 222 P. 9 (1924), where a quiet title action could not be maintained by a citizen against the university to determine interest in their property.

Unfortunately then, automobile driver Price, on March 13, 1944, ran into a Wyoming Highway Department snowplow and after a demurrer to the complaint was sustained, immunity reappeared before this court. A lack of legislative consent to suit justified the deletion of the state as a party. *Price*, 167 P.2d 309. This court then added contributory negligence as a matter of law for justification for the dismissal to also include claims against the highway superintendent and snowplow driver. *See likewise Osborn v. Lawson*, 374 P.2d 201 (Wyo.1962). A curious decision in *Harrison v. Wyoming Liquor Commission*, 63 Wyo. 13, 177 P.2d 397 (1947) defined that the proprietary activities of the state in the sale of liquor were actually governmental and lacking permissive legislation, rendered the business agency immune from suit.

In *Savage v. Town of Lander*, 77 Wyo. 157, 309 P.2d 152 (1957), plaintiff, after parking, stepped out of the car into a gutter drain inlet, fell and was severely injured. The directed verdict brought the escape of governmental immunity to the supreme court for an analysis differentiating between the planning criteria of a public improvement and negligence in maintenance so that:

> To recapitulate, we find that the gutter drain was built according to a plan approved by the town of Lander, that the plan was not so inherently dangerous that the trial court could as a matter of law deem its construction to be negligent, that there was some evidence of defendant's negligence in the maintenance of the gutter drain but there was no proof whatever that such neglect caused plaintiff's injury.

*Id.* at 175, 309 P.2d 152.

This first sequence of Wyoming cases ended with *Maffei*, 338 P.2d 808 as an action for wrongful death of decedent through contended negligence of the town's officer directing him to assist in pursuit of a felon. A demurrer to the complaint was sustained, plaintiff appealed, and the decision was affirmed on the basis that the municipality was immune from liability when exercising its governmental function with immunity unwaived even by procurement of liability insurance. Consequently, the insurance company escaped liability responsibility within its stated insurance coverage by assertion of a governmental immunity defense.

The platitudes were again forthcoming:

> Although we must hold that in the present state of the law of this State, the town of Kemmerer is immune from liability to the family of the deceased, we are not insensible that this may be inequitable. The deceased may have naturally joined in aid of the local policeman and suffered death as a consequence. In this view, Mr. Maffei was acting in a commendable manner and as might be desired of all good citizens. In not dissimilar circumstances our legislature has seen fit to take notice of some shortcomings in our law and have enacted separate laws for the relief of bereaved families. It is our misfortune in a case such as this that we are not privileged to respond to the dictate of our sympathies, but must stay with the law as we find it.

*Id.* at 818. The author of the opinion did not consider the constitutionality of special legislation "for the relief of bereaved families." *Id.* at 818. See Section X of this dissent, infra, which addresses the Wyoming constitutional prohibition of special legislation.

## IV. MODERNIZATION OF WYOMING LAW

The broad scope of Chapter 89 can only be related to its scope of operation to all units of government. I will not secrete

from its text the limited arena which the legislature should have properly and probably constitutionally addressed of design defects and functional obsolescence by criteria changes. Neither of those subjects have anything to do with failure of a repair crew to mark the edge of this narrow and recently resurfaced highway so that the nighttime driver can tell where the edge of the road ends. The broad sweep of this legislation in creation of immunity according to place requires a similarly broad analysis for proper judicial review.

Within this perspective, it has to be recognized that a significant number of historically emplaced and existent Wyoming decisions as to driveway, parking and sidewalk liabilities are now reversed by the legislative withdrawal of responsibility for government's negligence.

I am also attentive to the special concurrence of Chief Justice Guthrie in *Jivelekas*, 546 P.2d at 433:

> I concur in the result hereof based upon the failure of plaintiffs to prove that any actions of the city were the proximate cause of the injury and agree that the doctrine of res ipsa loquitur does not aid plaintiffs. I withhold my agreement, without expression of my views, from that portion of the opinion which discusses sovereign immunity for the reason that I deem it improper and unnecessary of decision to reach this question because of the disposal made upon these first two grounds. * * * Nor am I satisfied that the immunity doctrine as applied to governmental subdivisions, such as counties, school districts, and municipalities, has the same origin and roots as, or is identical to, that of the sovereign immunity of the State, and would express no view thereon at this time.

Even Justice Raper, in his dissent in *Jivelekas*, 546 P.2d at 434, recognized the appropriateness of change:

> It is not the duty nor the function of this or any court to tell a legislature how to perform its legislative function. The strength of Justice Rose's opinion, though I disagree that we should allow it, should be a warning that legislative action may be well-advised. It is preferable to start with a sound plan, such as only an example, the Federal Tort Claims Act, than for this court to say, "do it," in the absence of any machinery to place an ordered change into sensible effect.

Governmental immunity was abolished in *Oroz*, 575 P.2d at 1158 (footnote omitted) by Chief Justice Guthrie's continuing scholarship:

> We hold that the immunity from tort liability heretofore judicially conferred upon counties (municipal corporations, school districts, and other subdivisions of government) is abrogated. Henceforth, the rule is liability—the exception is immunity, *Holytz v. City of Milwaukee*, supra [17 Wis.2d 26, 115 N.W.2d 618, 620]. The removal of immunity, however, does not mean that a governmental entity is liable for all harm that results from its activities. It does not impose absolute or strict liability, but merely subjects it to the same rules as private persons or corporations if a duty has been violated and a tort has been committed. * * * This decision, however, is not to be interpreted as imposing liability upon a governmental body for acts or omissions in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions, *Hargrove v. Town of Coca Beach*, supra, 96 So.2d at 133; *Holytz v. City of Milwaukee*, supra, 115 N.W.2d at 618. We herein specifically reverse all prior decisions of this court which hold or suggest that a county or other such political subdivision has or enjoys an immunity from tort liability.

Justice Raper also recognized the tide of events:

> While the whole court does not join in saying so, at this point and time, it appears to me that the handwriting is on the wall and the legislature might be well advised to prepare the State and arrange for funding of proper tort claims against it. The court by its opinion is taking immunity away from the county. A county is a unit and arm of State government, by which many functions of

state administration are decentralized, such as tax assessment and collection through the county assessor and treasurer; enforcement of the State's laws, through a county sheriff and a prosecuting attorney; supervision of elections through the county clerk; support for the State's judicial system, through the clerks of court and furnishing of court facilities by county commissioners; a local network of roads, forming a part of the State's highway system, through county commissioners; legislative apportionment by county and combinations of counties, etc., etc. The court may have reached the State through the county.

*Id.* at 1161.

The winds of change were blowing as the second period of legislative analysis of governmental and sovereign immunity arrived to continue in a definable fashion until now reversed as full retreat develops with this present case. In *Lore v. Town of Douglas,* 355 P.2d 367 (Wyo.1960), the city was liable for negligent maintenance of sewer lines. Next followed *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne,* 371 P.2d 409 (Wyo.1962), which reversed *Langley,* 84 P.2d 767, in holding that another fair trade law was unconstitutional as violative of due process and equal protection. *Bell v. Gray,* 377 P.2d 924 (Wyo.1963) determined that insurance salesman exemption constituted an unconstitutional discrimination. However, in *Chavez v. City of Laramie,* 389 P.2d 23 (Wyo.1964), road construction caused damage to the plaintiff and invaded a governmental function for which the municipality was not answerable in tort for their negligently caused damage. Directly contrary in *Fanning v. City of Laramie,* 402 P.2d 460 (Wyo.1965), a discerned duty to maintain a street sign waived immunity defense. *South Cheyenne Water and Sewer Dist.,* 483 P.2d 240 followed that a governmental instrumentality of a sewer district was liable for sewer backup damage. In *Town of Douglas v. York,* 445 P.2d 760 (Wyo.1968), this court found the Town of Douglas liable for a range fire which was started by a fire at the town dump. The Town of Douglas had charged for trash disposal and was as liable as a corporation would have been.

Admittedly, the case law has been inconsistent. In *Davis,* 495 P.2d 21, the county was shielded by governmental immunity from responsibility for the injuries it had negligently caused. Retail clerks attempted an unsuccessful declaratory judgment against the University of Wyoming in a labor dispute in *Retail Clerks Local 187 AFL–CIO v. University of Wyoming,* 531 P.2d 884 (Wyo.1975). This court's conclusion in that case was there was no statutory waiver permitting this litigation. In *Awe,* 534 P.2d 97, a dormitory was rented for the summer season to visiting families for classroom attendance. Sovereign immunity and improper notice denied adjudication of the dangerousness of the college facility which caused a serious window fall injury. Conversely in *Collins v. Memorial Hospital of Sheridan County,* 521 P.2d 1339 (Wyo.1974), we determined that the purpose of insurance constituted a waiver of immunity, at least to the amount of the insurance coverage, and recognized that in response to *Maffei,* a statute had been enacted. The case was directly contrary to *Maffei* as perhaps explained by the change in membership of the court that had occurred. *Jivelekas,* 546 P.2d 419 was the beginning of the end with the academic and enthusiastic attack by Justice Rose, although his opposition to immunity was not the basis of case decision within the panel of the court then sitting. In *Town of Jackson v. Shaw,* 569 P.2d 1246 (Wyo.1977), a successful verdict for the falsely arrested plaintiff was affirmed. The end to governmental immunity then came in *Oroz,* 575 P.2d 1155, which specifically reversed *Davis,* 495 P.2d 21 and buried governmental immunity as an outdated and discarded judicial conception. Sovereign immunity remained in question, although Justice Rose, in concurrence, persuasively observed for a period of time as now ending with the enactment of Chapter 89:

> In my judgment, however, the opinion should have specifically embraced such abrogation of governmental *and* sovereign immunity as would include the State of Wyoming. As the opinion now stands,

the subject of the State's immunity is not precisely considered, even though the language may be broad enough to abrogate the State's sovereign immunity. My views on this subject are sufficiently set forth in *Jivelekas v. City of Worland,* Wyo., 546 P.2d 419, and need not be reiterated here. Suffice it to say that I am unable to recognize any substantive distinction between the so-called doctrines of sovereign and governmental immunity which would justify separate treatment by this court. See, *Muskopf v. Corning Hospital District,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 [(1961)]; and *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618. Furthermore, as explained in *Jivelekas,* supra, 429–431, Article 1, § 8, Wyoming Constitution, should not prevent such a total abrogation in light of the thrust of that provision and the decisions of this court which have touched and concerned its applicability. Notwithstanding the failure of the majority to speak to the abrogation of the State's immunity in this decision, I am confident that, even if the opinion's scope is not broad enough to include the State, nevertheless, the curtain is slowly but surely falling on this illogical and inexcusable chapter of legal history in Wyoming. Whether the final lines of this tragic drama will be read and acted upon by this court or by the legislature remains to be seen, but in fairness to those who are hurt by the agents of the State but may still be left without a remedy, the day of their relief cannot be far away.

*Oroz,* 575 P.2d at 1161 (emphasis in original).

It is sad to observe that the Wyoming Governmental Claims Act, W.S. 1–39–101 through 1–39–119, has been subjected to a barrage of legislative efforts to diminish the delivery of justice to the negligently injured. *See Worthington v. State,* 598 P.2d 796 (Wyo.1979) and 1982 Wyo.Sess. Laws ch. 24. *Oyler v. State,* 618 P.2d 1042 (Wyo.1980) invoked a factual development of a ministerial discretionary test as to the immunity of the state employee and required a reversal of the previously granted summary judgment. *Connett v. Fremont County School Dist. No. 6, Fremont County,* 581 P.2d 1097 (Wyo.1978) required reversal of summary judgment on appeal in analysis of the duty of the school to supervise the activities of the student as raising a question of negligence. *O'Donnell v. City of Casper,* 696 P.2d 1278 (Wyo.1985), was a street maintenance invoking obvious danger rule and potential liability of the municipality. *Stovall,* 648 P.2d 543, was a public facilities segment of the tort claims act which discerned and determined that the highway constituted a public facility. Conversely, *Hurst v. State,* 698 P.2d 1130 (Wyo.1985) was a discretionary aspect of parole board responsibility invoking a governmental immunity justification.

Two final cases of this court require recognition. *Troyer v. State, Dept. of Health and Social Services, Div. of Vocational Rehabilitation,* 722 P.2d 158 (Wyo.1986) presented the inquiry whether the construction of an elevator for the handicapped constituted a function as a health care provider. The court also, in current analysis, found that the closed-end immunity approach adopted in Wyoming as similar to New Mexico was constitutional. The issue not answered in concept or ratio decidendi is whether, after rights to recover for negligently inflicted injury have been given by statutory extinguishment of immunity, the legislature can then recreate the defensive barrier to justice for irrationally segmented activities. Finally in *Hoem v. State,* 756 P.2d 780, 784 (Wyo.1980), this court, as now denied in application by the majority in present review, adopted the heightened scrutiny test. It is apparent that this majority disregards what was intrinsic a year ago in *Hoem,* 756 P.2d at 785 under the special concurrence by Justice Thomas:

> The "heightened scrutiny" standard, which it applied, eschews a presumption of constitutionality, which must be overcome by one who challenges the statute when the rational basis test is invoked and requires greater justification for the classification. At the other end of the spectrum, the standard also eschews the

heavy burden of proof placed on the state to demonstrate a compelling state interest, which the "strict scrutiny" standard requires. Instead, as explained by the Kansas court [*Farley v. Engelken,* 740 P.2d 1058 (Kan.1987)], the "heightened scrutiny" standard requires "the statutory classification to substantially further a legitimate legislative purpose." In reaching this determination, the "heightened scrutiny" analysis requires that the interests of the burdened class be balanced against those of the benefited class, in the context of the legislative purpose. This standard peculiarly is applicable in an instance such as this, which does not involve any political question of importance to the state but essentially touches upon private interests. Utilization of the "heightened scrutiny" standard in this case seems eminently fair.

I concurred with Justice Thomas in *Hoem,* but the challenged legislation in that case was unconstitutional by even a rational basis test as now applied to Chapter 89 that it

> cannot be sustained under the "heightened scrutiny" test. Setting apart victims of [highway accidents] from victims of other tortious conduct as a separate class is patently unrelated to any reasonable or rational state purpose, nor can it be justified by any state of facts that reasonably might be conceived. Of a certainty, there is no legitimate legislative purpose for this classification that would survive the "heightened scrutiny" test.

*Hoem,* 756 P.2d at 785.

## V. CHAPTER 89—WHAT IT DOES TO THE WYOMING GOVERNMENTAL CLAIMS ACT

Wyoming stood way back in progress to eliminate the parasitic deterrent of immunity which withheld fairness and justice for the injured individual, but the state now reverses field to move against the tide for restoration of injustice. It is not the old platitudes soundly denuded by Edwin M. Borchard and perhaps 500 other writers in text and law journal articles, but a new summons that Wyoming is now called to constitutionally face by this reversed legislative direction toward central authority and statism against interest of the wrongfully injured individual.

The principle thesis of this dissent, borne by an aversion to monarchy, dictatorship or any centralized autocracy as a feudalistic bureaucracy, is a question of how society can constitutionally step back into the morass. In the face of the clear commands of the Wyoming Constitution, I conclude that it cannot be done this way.

Chapter 89, as it relates to this one vehicle rollover after highway patching activities, cannot be constitutionally pulled out and excluded from the scope of the statutory intercession used to generally deny potential relief to any injured highway user.

The Wyoming Governmental Claims Act[8] as proudly announced in the 1979 enactment, 1979 Wyo.Sess.Laws ch. 157, stated in part:

> **1–39–102. Purposes of act.**
>
> (a) The Wyoming legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of governmental immunity and is cognizant of the Wyoming Supreme Court decision of *Oroz v. Board of County Commissioners,* 575 P.2d 1155 (1978). It is further recognized that the state and its political subdivisions as trustees of public revenues are constituted to serve the inhabitants of the state of Wyoming and furnish certain services not available through private parties and, in the case of the state, state revenues may only be expended upon legislative appropriation. This act is adopted by the legislature to balance the respective equities between persons injured by governmental actions and the taxpayers of the state of Wyoming whose revenues are utilized by gov-

8. In the 1977 legislative session, a governmental claims act, House Bill 186, had also been passed by the legislature to be vetoed by the governor following objection by the office of the attorney general. Digest of House Journal, Forty–Fourth State Legislature of Wyoming 231 (1977).

ernmental entities on behalf of those taxpayers. This act is intended to retain any common law defenses which a defendant may have by virtue of decisions from this or other jurisdictions.

(b) In the case of the state, this act abolishes all judicially created categories such as "governmental" or "proprietary" functions and "discretionary" or "ministerial" acts previously used by the courts to determine immunity or liability. This act does not impose nor allow the imposition of strict liability for acts of governmental entities or public employees.

The act, after a rocky pathway from conception to ultimate passage, achieved only by continued unrelenting effort, has since been subject to almost annual dilution [9].

The initial governmental claims act, 1979 Wyo.Sess.Laws ch. 157, embraced driveways and walkways in highway, city, county and educational institutions within a public facility category:

> **1–39–111. Liability; public facilities.** A governmental entity is liable for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of public facilities within the jurisdiction of the employing governmental entity.

*See Stovall,* 648 P.2d 543. The legislature of 1986, in attacking rights to redress of the citizen for negligent injury in fault of the governmental instrumentality (as a year, not a good one for the basic act), did two material things. First, in section one, exclusions from waiver of immunity were adopted:

> **Section 1.** W.S. 1–39–120 is created to read:
>
> **1–39–120. Exclusions from waiver of immunity; highways, etc.**
>
> (a) The liability imposed by W.S. 1–39–105 through 1–39–112 does not include liability for damages caused by:
>
> (i) A defect in the plan or design of any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area;
>
> (ii) The failure to construct or reconstruct any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area; or
>
> (iii) The maintenance, including maintenance to compensate for weather conditions, of any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area.

1986 Wyo.Sess.Laws ch. 89, § 1.

Then, for whatever reason not discernible in any record available, the act in section three also repealed W.S. 1–39–111 which created the non-immunity category of public facilities. Consequently, unless a bridge, culvert, highway, roadway, street, alley, sidewalk or parking area can be put within motor vehicles, aircraft or watercraft, W.S. 1–39–105; a building, recreation area or public park, W.S. 1–39–106; an airport, W.S. 1–39–107; a public utility, W.S. 1–39–108, which includes gas, water, electric, solid or liquid waste collection, heating and ground transportation; or a medical facility, W.S. 1–39–109; there is little (except perhaps snow plows and school buses) available in present law upon which the exemptions provided in W.S. 1–39–120 can react.[10] This is symptomatic of

9. *See* 1980 Wyo.Sess.Laws ch. 46; 1981 Wyo. Sess.Laws ch. 142; 1986 Wyo.Sess.Laws ch. 15; 1986 Wyo.Sess.Laws ch. 19; 1986 Wyo.Sess. Laws ch. 74; Chapter 89; 1986 Wyo.Sess.Laws ch. 142; 1986 Wyo.Sess.Laws ch. 181; 1987 Wyo.Sess.Laws ch. 93; and 1988 Wyo.Sess.Laws ch. 45.

10. The repeal of W.S. 1–39–111 as the public facilities section for the closed-end immunity statute has infinitely more complexities and effect than the exception to the immunity expulsions of W.S. 1–39–120. Strangely in litigation, appeal and now majority opinion, the most significant provision of Chapter 89 is completely ignored. As an example, the terminology of W.S. 1–39–111 in original enactment had changed from streets and alleys to public facilities. The change related to inclusion of rest facilities constructed by the highway department adjacent to the highway system. See Digest of House Journal, Forty–Fifth State Legislature of Wyoming 128 (1979) and record for appeal, *Stovall,* 648 P.2d 543. Now apparently outside of the latrine door, immunity; inside of the building, W.S. 1–39–106, responsibility (unless one is to define highway rest facilities as recreation areas).

the moribund residue left to protect citizens from the negligent deprecations of agents of government. There is no justification to serve for levels of comparison.

Specifically, the 1986 act repealed *Oroz,* 575 P.2d 1155 from which justification for passage of the basic act had been obtained, even though the philosophical standard and the case citation of *Oroz* still remain in the statutory text. Also rejected in broad category of walkways and driveways of our society was the further statutory recognition:

> [T]he state and its political subdivisions as trustees of public revenues are constituted to serve the inhabitants of the state of Wyoming and furnish certain services not available through private parties and, in the case of the state, state revenues may only be expended upon legislative appropriation. This act is adopted by the legislature to balance the respective equities between persons injured by governmental actions and the taxpayers of the state of Wyoming whose revenues are utilized by governmental entities on behalf of those taxpayers. This act is intended to retain any common law defenses which a defendant may have by virtue of decisions from this or other jurisdictions.

1979 Wyo.Sess.Laws ch. 157, § 1.

No funeral for the progressive philosophy was provided by even the good sense to delete the case reference when statutory repeal was pursued. Other cases the legislature reversed for denial of further liability would include: *O'Donnell,* 696 P.2d 1278; *Stovall,* 648 P.2d 543; as well as the prior cases of *Town of Douglas,* 445 P.2d 760; *Fanning,* 402 P.2d 460; *Quest v. Town of Upton,* 36 Wyo. 1, 252 P. 506 (1927); and *Opitz,* 249 P. 799. *Cf. Oyler,* 618 P.2d 1042; *State v. Dieringer,* 708 P.2d 1 (Wyo.1985); and *Hamlin v. Transcon Lines,* 697 P.2d 606, *reh'g denied* 701 P.2d 1139 (Wyo.1985).

It is indicated in the minutes of the joint judicial committee which are included in this record that the original purpose of Chapter 89 was to restore governmental immunity for highway maintenance and design. If that was the justification for what was done, the tools used included both meat ax and chain saw as all of the places for driving and walking in this state became included in the created immunized zone of irresponsibility. That reach is from windrowed snow to summer potholes.[11]

The effect of Chapter 89 is to excise out of a citizen's right for recovery for wrongful injury by agents of government a place exception, but one unfortunately where the greatest exposure to harm exists where you can walk or drive outside. This created exception has a classification basis only related to place—outside the door immunity—inside the door liability. It does not present consideration of design versus maintenance defects, nor does it anticipate the difference between governmental or propriety functions and discretion or ministerial acts, since those characters of differentiation of scope of responsibility of society have been specifically eliminated by the initial governmental claims act itself. The placement in excused responsibility for fault and negligence lacks absence of analysis of the difference between passive and active negligence or wrongfulness sounding within the character of a lack of care compared to willful and gross misconduct. Furthermore, Chapter 89 discriminatorily creates a character of governmental immunity, which had never existed in this state, while at the same time restoring sovereign immunity to the State Highway Department as a separate function. Finally, craftsmanship in statutory composition is absent by leaving in question reflected immunity of the agent for absolution from

11. The challenge in concept is to anticipate what in addition to the geographical confines of walkways and driveways was immunized by W.S. 1-39-120 from liability as well as what happens to roads, bridges and sidewalks in parks and other recreational facilities. Outdoor national guard facilities perhaps could apply with institutions of confinement where outside activities do occur. *See* 1975 Wyo.Sess.Laws ch. 171. The incongruities that may result are presently unimaginable when related to all circumstances where injury to the body from negligence of the public employee can occur.

his own negligence as a theory related to institutional immunity for the governmental unit by which he may be employed. In text, the employee exclusion within the scope of duty of W.S. 1-39-104 requires relation to W.S. 1-39-120, which only includes exceptions applied to W.S. 1-39-105 through 1-39-112.

## VI. STANDARD OF REVIEW

It is not necessary to challenge the closed-end tort claims system adopted by the state legislature in 1979 to eliminate sovereign immunity to now constitutionally reject Chapter 89. This is true no matter how unjustified or unreasonable as well as illogical the denial of recovery to the individual for the deprecations upon his body by agents of the government might be since applied immunity has an existence by historical recitation of stare decisis. However, like the rotten stump or an outdated building as a non-conforming use, this rejected and irresponsible concept need not be immediately removed or destroyed. However, it should neither be recreated nor restored to press back against a constitutional right of membership of society to require their detachment from compensation for bodily injury or death. Secondly, the entrenchment as set forth in the enacted statute lacks sufficient justification to withstand constitutional inquiry when examined upon the table of justice provided by limitations in the Wyoming Constitution on what the legislature can do to harm or injure its citizens. Just as immunization from responsibility promotes irresponsibility, absolution from liability for negligence justifies carelessness and moralizes injury and death for someone else to be "only one of those things" for which tortfeasor responsibility is foreclosed.

The circumstance as found in this case that a narrow highway exists cannot be compared to failure to install drop off notices or differentiating markers to warn the user when resurfacing creates an obvious greater zone of danger to the driving customer for whom the highway system exists. Similarly, a broken sidewalk can be rendered safer by patching or signs even if not immediately replaced. There is nothing wrong with the requirement to defend as a salutary opportunity for the citizen to assert his claim to justice. In applying a place test for both created and reapplied immunity, the legislature in Chapter 89 selected an irrational difference to define a result without functional justification except as directed to deny justice within the special territory identified for that insulation from responsibility—walkways and driveways outside of buildings.

I would first challenge this court in dissent in requiring that a heightened scrutiny of responsibility be applied when recovery for death or injury of a person is to be cognitively involved as a protection compared to property which remains unquestionably within the most strict scrutiny review. When sovereign immunity to take ranch property and trucking equipment without payment is justified, I could relate to a test of only a reasonable basis for physical injury or damaged life to be equally protected. Otherwise, I do not. This court procedurally and comprehensively perceives by the test of heightened scrutiny to test the validity of a medical review panel. No less important is the absolution of government for responsibility for the negligent infliction of injury or death. The generic problem broadcast from the crescendo of cases addressing the test for review in question of denial of basic constitutional rights, including due process and equal protection, is the poorly disguised fact that the test, if first chosen, is to justify the dispositional result intended.

Consequently, the analysis in cases begins with comment that this contention of denial only justifies the modest or minimal support of reasonableness and communicates no matter what is involved, the supplicant has been denied. If heightened scrutiny is addressed as a test, the rationality and totality will be given analysis and the third or highest scrutiny denomination means a perceived basis for discrimination exists to be corrected by judicial relief. Compare for example the rights to education, *San Antonio Independent School Dist. v. Rodriquez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied* 411 U.S.

959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973) (White and Marshall, JJ., dissenting), which reaches the fundamental societal existence of either a free enterprise system of industry or a democratic organization of representative government with equal rights of a female to serve as an executor or personal representative which, although the right will never be denied, the future of the nation is not invested. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). I do not differentiate the right to freedom from or compensation for loss of limb or life as less important than the right to vote. *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); the right to fairness in procedures before governments which may deny life, liberty or property; *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (Stewart J., dissenting); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), requirement for indigent to prepay divorce proceeding filing fees; but although divorce is fundamental, bankruptcy is not; *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the right to marry; *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), right to freedom of speech; *McLaughlin v. State of Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), prohibiting interracial cohabitation; *National Ass'n for Advancement of Colored People v. State of Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), right to travel interstate. Likewise, I can here, in life and body, find equivalency with employment of a residential alien in the state's competitive classified civil service or to take the bar examination, *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Application of Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), or a year's residence in the county for hospitalization or medical care at county expense.

The issue at stake is not whether due process in federal or state constitutional context creates a claim in tort. *Cf. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Here we have a statute which dispossesses the Wyoming judiciary from affording relief to the victims of tortious conduct where the harm happens in a circumstance selected by place and the actor is some type of state employee. Although the continuity of the United States Supreme Court cases relating to constitutional rights to recover for injury and death is minimal or unprotected while property rights have been given a broad constitutional respect, it makes little or no sense in metaphysical recognition of self and body. The direct failure here is logic to sustain the constitutionality of this character of denied justice for the individual. *See De Ayala v. Florida Farm Bureau Cas. Ins. Co.,* 543 So.2d 204 (Fla.1989). Like denial of worker's compensation benefits there, denied right to recover here justifies the judicial heightened scrutiny.

Efforts to justify immunization of negligence when committed by public officials in their exercise of responsibilities for roadways and walkways cannot be logically related to the discretional processes inextricably involved in dealing with the minds of people by parole and probation officers where uncertainty is the only constant. *Hurst,* 698 P.2d 1130; *Martinez v. State of California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh'g denied* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980). In one, we consider fault and carelessness as measured generally for activity. The other is decisional in function without standards of right or wrong in the intangibles of exercised professional responsibility. I can find the discriminatory denial of access to the courts and rights to have compensation for wrongfully caused injuries as a prohibited territory for legislation when within its face the enactment encroaches upon specific prohibitions of the Wyoming Constitution and that the inquiry requires the more exacting judicial scrutiny initially conceived in *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 784 n.

4, 82 L.Ed. 1234 (1938). A liberal construction of the rights of citizens is justified, *Federal Housing Administration, Region No. 4 v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). It is a " 'wholesome sight to see [government] * * * answering for its torts' " and responsible for every act done without legal justification. *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 59, 64 S.Ct. 873, 879, 88 L.Ed. 1121 (1944) (Frankfurter, J., dissenting) (quoting 3 Maitland, Collected Papers, 263). *See also United States v. Aetna Casualty and Surety Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949).

I agree with Justice Stevens in his citation quoting Judge Cardozo that " '[n]o sensible reason can be imagined why the State, having consented to be sued, should thus paralyze the remedy.' " *Finley v. United States,* — U.S. —, 109 S.Ct. 2003, 2023, 104 L.Ed.2d 593 (1989) (quoting *Anderson v. John L. Hayes Const. Co.,* 243 N.Y. 140, 147, 153 N.E. 28, 29 (1926)). I choose also to be guided by the wisdom of Judge Cardozo quoted in *Finley.* Furthermore, I speak strongly in recognition of the philosophic validity of present challenge: "The freshness of error not only deprives it of the respect to which long-established practice is entitled, but also counsels that the opportunity of correction be seized at once, before state and federal laws and practices have been adjusted to embody it." *South Carolina v. Gathers,* — U.S. —, 109 S.Ct. 2207, 2218, 104 L.Ed.2d 876, *reh'g denied* — U.S. —, 110 S.Ct. 24, 106 L.Ed.2d 636 (1989) (Scalia, J., dissenting).

> A more [or most] principled approach would involve a brief look at the goals of tort law. For the law of unintentional harms, there are two major goals. One is to compensate individuals who have been injured in accidents and who were not responsible for the accident in any significant sense. Thus, the injured individuals are victims of external forces, and they deserve compensation. * * *
>
> The second major goal is to influence actors—often businesses [or here, government]—to behave in ways that society desires.

Fox, *A Century of Tort Law,* Trial, July 1989 at 78, 87. I would add a third goal—protection of you and me.

> After the years in which the strict scrutiny-invalidation and minimal scrutiny-nonintervention correlations were virtually perfect, the pattern has suddenly become unsettled. After an era during which the "mere rationality" requirement symbolized virtual judicial abdication, the Court—following personnel changes in a noninterventionist direction—has suddenly found repeated occasions to intervene on the basis of the deferential standard.

Gunther, *The Supreme Court 1971 Term —Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 19 (1972).

## VII. OUTDATED, OUTWEIGHED AND UNJUSTIFIED REINCARNATION OF PAST MISTAKES

United States Supreme Court Justice John Marshall wrote:

> In the 3d vol. of his Commentaries (p. 23), Blackstone states two cases in which a remedy is afforded by mere operation of law. "In all other cases," he says, "it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded." And afterwards (p. 109, of the same vol.), he says, "I am next to consider such injuries as are cognisable by the courts of the common law. And herein I shall, for the present, only remark, that all possible injuries whatsoever, that did not fall within the exclusive cognisance of either the ecclesiastical, military or maritime tribunals, are, for that very reason, within the cognisance of the common-law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress."
>
> The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy

for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.

It behooves us, then, to inquire whether there be in its composition any ingredient which shall exempt it from legal investigation, or exclude the injured party from legal redress. In pursuing this inquiry, the first question which presents itself is, whether this can be arranged with that class of cases which come under the description of *damnum absque injuria;* a loss without an injury.

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163–64, 2 L.Ed. 60 (1803).

It was *Langford v. United States,* 11 Otto 341, 101 U.S. 341, 343, 25 L.Ed. 1010 (1879) which rejected the old English notion of the royalty that "the King can do no wrong" as a basis for creating immunity. "It is not easy to see how the first proposition can have any place in our system of government. We have no king to whom it can be applied." *Id.* at 343.

In *United States v. Lee,* 106 U.S. 196, 220, 1 S.Ct. 240, 260, 27 L.Ed. 171 (1882), *limited to unconstitutional taking sub nom. Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962), that court said:

> Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class.

The extended dissent in *Lee* was not to be lightly relinquished. *Lee* was followed by *Kawananakoa v. Polyblank,* 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907), where Justice Holmes asserted:

> A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends. * * *
>
> * * * A suit presupposes that the defendants are subject to the law invoked. Of course it cannot be maintained unless they are so. But that is not the case with a territory of the United States, because the Territory itself is the fountain from which rights ordinarily flow.

Any vision that law is logic is dispelled by a journey through the forensic history of immunity case law. The spectacle of misapplied dictum and unjustified legal theories demonstrates that immunity exists despite the fact that it is not historically justified or moralistically sustainable. There is no subject in the law which has accumulated such weight of scholastic condemnation for unnumbered decades. Yet like a spore or a virus, it refuses to die. The curiosity of immunity in a democratic society is that it survives in the fashion it has, and now in Wyoming, mutates to redevelop without scholarship or logical justification, except a continued repetition as if by restatement the initial concept achieves a validity unsupportable within the concept itself. Characterized from the *Men of Devon,*[12] the menu provided is that somehow in logic there is no harm unless a remedy exists.

Pain, bodily damage or death as an activity only exists in the actuality of the adjudicatory system if the wrongdoer, as in immunity, the instrumentalities of the state, can be called to respond for fault. It is curious that those who rail against the state, in favor of the individual, become strangely silent when that individual who has been maimed by the government asks for justice. Their slogan no doubt becomes, "Ask not what bills your country can pay for you, ask what bills you can pay for your country."

The critical failure is the misunderstanding of the essence of a free society and the individual's right within the society to be protected from unjustified harm by the government which those individuals have created and now maintain.[13] The errone-

12. Or the King can do no wrong.

13. Unquestionably, the classic and most comprehensive intrinsic examination of the subject of governmental and sovereign immunity is Borchard, *Government Liability in Tort* (parts 1–3), 34 Yale L.J. 1, 129, 229 (1924); Borchard,

ous historical basis and ignoble moral justification of the immunities has given this parcel of the body of the law the heaviest criticism and disapproval of any subject within modern jurisprudence. Described at best as an abnormality or absurdity, it is more commonly recognized as an anachronism for modern society.

> As a result of feudal theory, then, we have the basis for much of the present-day theory of irresponsibility of the State. This theory, holding that the King can do no wrong; that he is irresponsible before the law of man; that he cannot be sued; but that the right of supplication exists, bears a close resemblance to certain contemporary ideas which will be discussed presently.
>
> In order to explain and justify the important changes that resulted from the downfall of the feudal system, with the waning power of the great nobles and the increased power of the sovereign, ingenious doctrines were developed by political theorists, theologians, and judges. The chief of these defined sovereignty, personified the Crown as the state, and applied the principle that the King can do no wrong.

Blachly and Oatman, *Approaches to Governmental Liability in Tort: A Comparative Study*, 9 Law and Contemp.Probs. 181, 183 (1942). It surely is established for immunity, both governmental and sovereign, that the head waters of its utilization and retention is not logic—it is inertia, greed and political philosophy. For a wide variety of reasons, its residual remnants and contrails outlast modern theories of social responsibility which have invoked social security, worker's compensation and unemployment compensation, not to mention aid to dependent children, guarantees for educational opportunity, as well as equal opportunities and confined rights of all citizens to vote. Immunity beyond that necessary for ministerial, discretionary, legislative, or judicial functions is no more than a reincarnation of past mistakes—now both legislative and judicial.

## VIII. PRECEDENT AVAILABLE FOR COMPARISON

A comprehensive review persuades me that in constitutional accommodation and democratic government idealism of the worth of the individual, Wyoming improvidently and precipitously moves backwards and out of constitutional justification.

In *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107, 109 (1963), the Arizona Supreme Court, in abolishing governmental immunity, first initiated in *Hernandez v. County of Yuma County*, 91 Ariz. 35, 369 P.2d 271, 272 (1962), quoted:

> "It requires but a slight appreciation of the facts to realize that if the individual citizen is left to bear almost all the risk of a defective, negligent, perverse or erroneous administration of the state's functions, an unjust burden will become graver and more frequent as the government's activities are expanded and become more diversified."

See also in considering a standard of review for access to the courts, *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984). Annotation, *Rule of Municipal Immunity From Liability For Acts in Performance*

*Governmental Responsibility in Tort* (parts 4–6), 36 Yale L.J. 1, 757, 1039 (1926–1927); Borchard, *Governmental Responsibility in Tort* (part 7), 28 Colum.L.Rev. 577 (1928); and Borchard, *Theories of Governmental Responsibility in Tort* (part 8), 28 Colum.L.Rev. 734 (1928). *See also* the definitive and thoroughly researched and carefully analyzed review as individualized to Wyoming in Minge, *supra*, VII Land & Water L.Rev. 229 and Minge, *Governmental Immunity From Damage Actions in Wyoming—Part II*, VII Land & Water L.Rev. 617 (1972). A course of education for bench, bar and legislator would not be unhealthy and might advance the recognition that the only validity of immunity in generic application is a feudalistic concept at best denied before statehood. The underpinnings is a thesis of federated governmental autocracy with a central theme that the perceived welfare of the system and majority justifies the sacrifice of the rights of the unlucky among the membership who sustain unjustified injury from fault, failure and neglect or negligence of that central authority. Curiously crossing the philosophic thesis of centralized autocracy and its supremacy to be isolated from responsibility for wrong, injury or death is a maintained standard that protection of property retains constitutional protection validity, but life, limb and health do not.

*of Governmental Functions as Applicable in Case of Personal Injury or Death as Result of a Nuisance,* 75 A.L.R. 1196, 1196 (1931) has a classic observation for the sociological aspects of sovereign immunity:

> The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, * * *.

The New Mexico Supreme Court agreed:

> We concede that there was ample authority which influenced our predecessors in adopting and upholding the doctrine of sovereign immunity. We also say that there is better reasoned authority to overturn it. We simply conclude that its continuance is causing a great degree of injustice.
>
> * * * * * *
>
> '" 'It is fundamental to our common law system that one may seek redress for every substantial wrong. "The best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequences of his misconduct...." ' *Battalla v. State,* 10 N.Y.2d 237, 240, 219 N.Y.S.2d 34, 36, 176 N.E.2d 729, 730 (1961)." '

*Hicks v. State,* 88 N.M. 588, 544 P.2d 1153, 1156–57 (1975) (quoting *Niederman v. Brodsky,* 436 Pa. 401, 403, 261 A.2d 84, 85 (1970)).

It is apparent that some retreat did occur in New Mexico by passage of the closed-end state tort claims act, but even that regression could not serve to justify the doubly regressive effect ulcerated onto justice for the injuries whenever now inflicted by this state. *Garcia v. Albuquerque Public Schools Bd. of Ed.,* 95 N.M. 391, 622 P.2d 699 (1980). The Colorado court in *Evans,* 482 P.2d at 969–70 (footnotes omitted) related:

> The monarchical philosophies invented to solve the marital problems of Henry VIII are not sufficient justification for the denial of the right of recovery against the government in today's society. Assuming that there was sovereign immunity of the Kings of England, our forebears won the Revolutionary War to rid themselves of such sovereign prerogatives.
>
> * * * [T]he doctrines of sovereign and governmental immunity have been made by the courts and, when it appears that these rules were wrong when made and wrong currently, the courts should abolish the rule.

In Washington, sovereign immunity was generally repealed by an enlightened legislature. See *Paulson v. Pierce County,* 99 Wash.2d 645, 664 P.2d 1202 (1983), even though the court thereafter only applied a minimum scrutiny test for classification. *See however Hunter v. North Mason High School,* 85 Wash.2d 810, 539 P.2d 845, 851 (1975) assessing in equal protection terms the invalidity of a non-claims statute in quoting from L. Levy, *Judgments: Essays on American Constitutional History* 18 (1972):

> "The Constitution deals with great powers, many of them undefined, but they are decentralized, separated and distributed, checked and balanced, limited and prohibited. At the same time, most notably through the Bill of Rights and the great Reconstruction amendments, the Constitution requires that the game shall be played freely and fairly, with the judiciary as the umpire. 'The great ideals of liberty and equality,' wrote Justice Cardozo, 'are preserved against the assaults of opportunism, the expediency of the passing hour, the erosion of small encroachments, the scorn and derision of those who have no patience with general principles, by enshrining them in constitutions, and consecrating to the task of their protection a body of defenders.' "

The Idaho courts have been singularly forthright in denunciation and decision on the immunities. In *Smith v. State,* 93 Idaho 795, 473 P.2d 937, 945 (1970) (quoting *Brown v. City of Omaha,* 183 Neb. 430, 160 N.W.2d 805 (1968)), the immunities were judicially excised except for " 'what

might be termed "ministerial or discretionary functions" nor on the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions. See *Holytz v. City of Milwaukee,* [17 Wis.2d 26, 115 N.W.2d 618] *supra.*' "

In *Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983), the court used the "means-focus" standard—the middle tier of their three standards—for equal protection analysis. This test examines the "means specified in the legislation and searches for a 'fair and substantial relation' between the means selected and the * * * legitimate purpose of the legislation." Id. 659 P.2d at 127. Technically, the Idaho legislature abolished government and sovereign immunity in advance of the judicially effective scheduled date established in *Smith,* 473 P.2d at 937, so that abolition was by the legislature in advance of a mandatory date affixed by the judiciary.

The philosophic overlay of rights of citizens for protection against the torts of the state is pursued in comprehensive detail by that court distinguishing duty from discretion. *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986). One of the members of that court noted in Hall, *Sovereign Immunity and Re-Emergence of the Governmental/Proprietary Distinction: A Setback in Idaho's Governmental Liability Law,* 20 Idaho L.Rev. 197, 197 (1984):

> Thus, when the government acts arbitrarily or unfairly in its dealings with the people, the basic foundations of the democracy are weakened. To the extent a government wrongs its citizens and permits that wrong to go without redress it loses a part of its license to govern.

*See also* Comment, *Lately "The King" Can Do Little Right: Idaho Governmental Immunity Doctrine in the Wake of Sterling v. Bloom,* 24 Idaho L.Rev. 291 (1987–88).

Strict scrutiny and particularized recognition of the effect of the constitutional guarantees of a speedy remedy for every injury of the Montana constitution found full enforcement in *White v. State,* 203 Mont. 363, 661 P.2d 1272, 1275 (1983) (emphasis added):

> The government has a valid interest in protecting its treasury. However, payment of tort judgments is simply a cost of doing business. There is no evidence in the record that the payment of such claims would impair the State's ability to function as a governmental entity or create a financial crisis. In fact, the State of Montana does have an interest in affording fair and reasonable compensation to citizens victimized by the negligence of the State. *Therefore, the strict scrutiny test mandated by the implication of a fundamental right has not been satisfied* and the statute prohibiting recovery for noneconomic damage is unconstitutional under the Montana State Constitution.
>
> We recognize that some limit on the State's liability may comport with the constitutional guarantees of equal protection. However, such a limitation cannot discriminate between those who suffer pain and loss of life quality and those who primarily suffer economically.

The principal judicial examinations within this region advancing the development of the law of responsibility of the central society for its harm to its people from negligence or tortious misconduct is provided by Kansas and California. Kansas has since regressed by legislative reaction to an airplane crash in Colorado which killed a college football team. In briefing in this case, the state and now the majority rely heavily on the Kansas disaster defined in real and illusionary terms and reject the humanistically directed adaptations of California. Even for Kansas, only part of the entire story is told by the adaptation of citations used.

Kansas, like most jurisdictions, has a troubled history of immunity litigation, but in quality of case writing, is impressive in logic, acrimonious in difference, and deeply directed in morality with frequent closely divided decisions. The modern law of Kansas commenced in the 1969 case of *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21, 27 (1969):

> After careful consideration a majority of the court is now of the opinion that it

is appropriate for this court to abolish governmental immunity for negligence, when the state or its governmental agencies are engaged in proprietary activities, in the absence of the legislature's failure to adopt corrective measures.

However, in abolishing governmental immunity to the extent suggested, we want it clearly understood that we recognize the authority of the legislature to control the entire field including that part covered by this opinion. We would suggest that the legislature is in a much better position than this court to restrict the application of the doctrine because it can supplement the restriction with proper legislation in the form of provisions for insurance, etc., as stated in 61 Columbia Law Review, Judicial Lawmaking, p. 839:

> "There is however, a limitation on judicial law making inherent in the nature of the judicial function. Courts can and indeed are called upon to adjust rights and liabilities in accordance with changing canons of public policy. But because they develop the law on a case-by-case basis they can not as can the legislature, undertake the establishment of a new legal institution, 'an elaborate procedure of investigation and consideration eventuating in the approval of a particular form of words as law.' "

First to be changed by legislative reapproachment was *Carroll,* which followed *Neely v. St. Francis Hospital & School of Nursing, Inc.*, 192 Kan. 716, 391 P.2d 155 (1964), where immunity for non-profit hospitals had been rejected when created by statute as declared unconstitutionally discriminatory. *Carroll* was then followed by *Woods v. Kansas Turnpike Authority,* 205 Kan. 770, 472 P.2d 219 (1970), which provided immunity protecting the turnpike authority against tort claims for negligently inflicted personal injuries. Inverse condemnation from the removal of lateral support was not similarly shielded from liability when negligently done by the state. *Sanders v. State Highway Commission,* 211 Kan. 776, 508 P.2d 981 (1973). No fault insurance met equal protection and due process constitutional test failures in *Manzanares v. Bell,* 214 Kan. 589, 522 P.2d 1291 (1974).

Then came the litigation for the 1970's by virtue of the crash of a university chartered airplane carrying the Wichita State football team. The court in *Brown v. Wichita State University,* 217 Kan. 279, 540 P.2d 66, 81–83 (1975), *opinion vacated in part* 219 Kan. 2, 547 P.2d 1015, *appeal dismissed sub nom. Bruce v. Wichita State University,* 429 U.S. 806, 97 S.Ct. 41, 50 L.Ed.2d 67 (1976) (emphasis added) said:

> Under present Kansas law, no regard is given to the injury or the facts and circumstances surrounding the events which caused the injury—it is the type of governmental agency and the activity in which it is engaged that determines whether the aggrieved party will find the doors of the court open or closed. Such a classification is forced and unreal, and greater burdens are imposed on some than others of the same desert. We find the classification contained in [the Kansas statutes] are not only "baffling," but arbitrary, discriminatory and unreasonable.
>
> The doctrine of governmental immunity is an historical anachronism which manifests an inefficient public policy and works injustice upon everyone concerned. The doctrine and the exceptions thereto, operate in such an illogical manner as to result in serious inequality. Liability is the rule for negligent or tortious conduct, immunity is the exception. But when the tortfeasor is a governmental agency, immunized from liability, the injured person must forego his right to redress unless within a specific exception. Equality is not achieved by artificial exceptions which indiscriminately grant some injured persons recourse in the courts and arbitrarily deny such relief to others. (*Winters v. Myers,* 92 Kan. 414, 140 P. 1033.) The operative effect of such arbitrary distinctions are incompatible with the constitutional safeguards established by both the federal and Kansas Constitutions. Accordingly, we hold [the Kansas statutes] are uncon-

stitutional and *void as a denial of equal protection of the law* under the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

* * * * * *

We do not subscribe to the belief that convenience is a pervasive legislative objective sufficient to totally deprive the appellants access to the courts. *Convenience is completely unacceptable as a standard by which to balance the rights of an individual against the interest of the state.* Convenience should not outweigh an individual's right to be compensated for actual damages sustained and injuries suffered. (*Muskopf v. Corning Hospital Dist.,* 55 Cal.2d 211, 11 Cal. Rptr. 89, 359 P.2d 457.) To hold convenience is a permissible legislative objective, sufficient to insulate the government from negligence, is to engage in incredulous reasoning, void of logic, which undermines the very principles upon which this nation was founded.

*Brown I* only lasted to rehearing in order to consider the effect of the post-1970 crash session of the state legislature which was directed to assure that families of the deceased football players would not be compensated by state government. *Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015, 1027, *appeal dismissed sub nom. Bruce v. Wichita State University,* 429 U.S. 806, 97 S.Ct. 41, 50 L.Ed.2d 67 (1976) (*Brown II*) (emphasis original), which validated the statute to recreate immunity in holding:

> In the absence of a suspect classification or a violation of a fundamental right, a statutory discrimination should not be set aside if *any state of facts reasonably may be conceived to justify it.*

In that justification, the majority found three favorable interests to be protected: (1) save money, (2) avoid investment of employee time in legal proceedings, and (3) protection of the state from high risk activities.

The dissent in *Brown II,* which was the majority in *Brown I,* recognized that the issue was not the *doctrine of governmental immunity,* but statutory utilization providing invidious discrimination.

> The majority cites no cases and my research reveals none which remain good authority for the proposition that a Legislature possesses *unlimited* power to statutorily grant or deny governmental liability in tort. That such legislative action is subject to the requirement of some rationality is illustrated by *Harvey v. Clyde Park Dist.,* 32 Ill.2d 60, 203 N.E.2d 573.

*Brown,* 547 P.2d at 1034. The author, quoting from Sherry, *The Myth That the King Can Do No Wrong: A Comparative Study of the Sovereign Immunity Doctrine in the United States and New York Court of Claims,* 22 Admin.L.Rev. 39, 57 (1969), stated:

> "[The doctrine's survival is but a] ... state of mind conditioned by the spectre that its relinquishment will bankrupt the sovereign and result in governmental paralysis. Such a theory may well have been justifiable in colonial times. But today there is universal agreement that immunity has far outlived its usefulness and is a discredited relic of the past not consonant with the needs of civilized society."

*Brown,* 547 P.2d at 1037. And analyzed in response that:

> The necessity of protecting the state treasury fails as a rational justification for discriminating between those persons who fall within the different classes created by [the Kansas statutes].
>
> The second "interest" cited as justifying the discriminatory classifications is equally indefensible. To say that government needs to be able to operate unhampered by the threat of legal actions intimates that the state should not be bothered by the fact it has injured people because it has more important things to do.
>
> > "... A government of 'of, by and for the people' derives its strength from being just and reasonable and not irresponsible in its dealings with the people ... 'To submit, in justification of the rule, that the immunity is neces-

sary for the proper functioning of [government], is to propound the obvious contradiction that the agency formed to protect society is under no obligation, when active itself, to protect an individual member of society.' " Blades [*A Comment on Governmental Tort Immunity in Kansas,* 16 Kan.L.Rev. 265] at 267–68 [(1968)].

To say that the threat of legal actions will intolerably hamper government activities is to say that government alone, among all our institutions, cannot properly function if it shoulders responsibility for its actions.

*Id.* at 1038.

After applying a similar critique of invalidity to a "high risk justification," Chief Justice Fatzer concluded:

But all three "interests" fail as reasonable justifications for making a distinction between the classes, created by the statute for an even more basic reason: the arguments supporting discrimination in favor of the state apply equally well to other governmental entities. If the state treasury needs protection, why do the treasuries of lesser units of government not need it even more?

*Id.* at 1039.

The operational difference in Kansas through *Brown II* was that the recreated immunity *did not include historical areas of liability for local units of government,* as is the present case here. Consequently, Kansas stands on a broadly different posture from Wyoming.

We have in this appeal an even more exacerbated discrimination invalidity by place where the negligent act occurs. In *Flax v. Kansas Turnpike Authority,* 226 Kan. 1, 596 P.2d 446, 451 (1979), the agency relearned that it was unconstitutionally excluded by immunity from liability:

To paraphrase *Carroll* [457 P.2d 21]: It is difficult to see why the state, counties, townships and cities performing precisely the same acts—e.g., the maintenance of a public thoroughfare—should be liable for defective roadways and the Kansas turnpike authority should not. * * * [The Kansas statute], which appellee contends would deny recovery to the turnpike motorists cannot be constitutionally valid as to that group in view of the other legislation which specifically grants a right of recovery to all other motorists.

The rule of *Flax* as following *Harvey v. Clyde Park District,* 32 Ill.2d 60, 203 N.E.2d 573 (1964) denied constitutionality based on classification by place. This course of Kansas cases could not then be properly concluded without recognizing *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058 (1987), attending a statutorily created medical review panel which was declared unconstitutional. It is not alone that *Farley* was a principle authority on our succeeding decision in *Hoem,* 756 P.2d 780, but the case served as a foundation for the test of review under the equal protection requirement intrinsically involved in our later conclusions in the succeeding medical review panel unconstitutionality conclusion. The Kansas court observed that "[a]s the above review illustrates, the level of scrutiny to be applied often determines the constitutionality of the statute." *Farley,* 740 P.2d at 1063. A heightened scrutiny review was undertaken for the access to the court foundational issues presented. The conclusion was that the Kansas Bill of Rights which provided that all persons for injuries suffered in person, reputation or property shall have remedy by the due course of law and justice administered without delay. Our court then followed that analysis with the similar heightened scrutiny in *Hoem,* 756 P.2d 780 for determination that the Wyoming medical review panel was also unconstitutional. In some present reasoned application of stare decisis, I observe that *Flax* and *Farley* should also decide this case to require a similar result for Chapter 89. Consistently for the Kansas malpractice statute, *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 757 P.2d 251 (1988), a cap for limitation of recovery on medical malpractice claims failed the constitutional tests of a right to due process and trial by jury. In recognizing invalidity, that court further observed that after abolition or a modifica-

tion of a common law remedy, there was no adequate substitute remedy provided. *The required quid pro quo was not included.* Note, *Statutory Caps on Damages and the Right to Jury Trial,* 54 Mo.L.Rev. 471 (1989). For Missouri law, compare generally, Comment, *Sovereign Immunity: A Framework for Applying Current Missouri Law,* 51 Mo.L.Rev. 535 (1986).

California jurisprudence moved faster and continued more emphatically. The philosophically foundational case which recognized the social invalidity of the immunities comes in Justice Traynor's seminal opinion in *Muskopf v. Corning Hospital District,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961). The author recognized in the decision of that court that divergent paths had led to the development of governmental or local immunities as contrasted with sovereign immunity, and that "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia," *id.* 11 Cal.Rptr. at 92, 359 P.2d at 460 (citing Borchard, *Governmental Responsibility for Tort,* 34 Yale L.J. 1, 129, 229; Casner and Fuller, *Municipal Tort Liability in Operation,* 54 Harv.L.Rev. 437; and Repko, *Commentary on Municipal Tort Liability,* 9 Law and Contemp.Probs. 214), and "[i]t has been judicially abolished in other jurisdictions." *Muskopf,* 11 Cal.Rptr. at 92, 359 P.2d at 460.

He concluded that

> [n]one of the reasons for its continuance can withstand analysis. No one defends total governmental immunity. In fact, it does not exist. It has become riddled with exceptions, both legislative * * * and judicial * * *, and the exceptions operate so illogically as to cause serious inequality. Some who are injured by governmental agencies can recover, others cannot: one injured while attending a community theater in a public park may recover * * *, but one injured in a children's playground may not * * *.

*Id.* 11 Cal.Rptr. at 92, 359 P.2d at 460 (citations omitted).

The moral persuasion and the humanistic logic of *Muskopf* led numerous other states to follow, including finally this state.

> Only the vestigial remains of such governmental immunity have survived; its requiem has long been foreshadowed. For years the process of erosion of governmental immunity has gone on unabated. The Legislature has contributed mightily to that erosion. The courts, by distinction and extension, have removed much of the force of the rule. Thus, in holding that the doctrine of governmental immunity for torts for which its agents are liable has no place in our law we make no startling break with the past but merely take the final step that carries to its conclusion an established legislative and judicial trend.

*Id.* 11 Cal.Rptr. at 95, 359 P.2d at 463. Our utilization of the persuasion of *Muskopf* in *Oroz,* 575 P.2d 1155 justified evaluation that its moral and logical content cannot be disregarded in properly reviewing the present actions of this court for what should be good law today.

*County of Los Angeles v. Superior Court of Los Angeles County,* 62 Cal.2d 839, 44 Cal.Rptr. 796, 402 P.2d 868 (1965) carries forward the persuasion of *Muskopf* in current testing of equal protection by use of the reasoned scrutiny review standard. *See likewise Serrano v. Priest,* 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), which became a monumentally important case on education and led the way for later developments in Wyoming in *Washakie County School Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied sub nom. Hot Springs County School District Number 1 v. Washakie County School District Number 1,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). The California court in *Brown v. Merlo,* 8 Cal.3d 855, 106 Cal.Rptr. 388, 506 P.2d 212 (1973), like Wyoming in *Nehring v. Russell,* 582 P.2d 67 (Wyo.1978) five years later, declared the guest statute to be unconstitutional. Overinclusion was the vice of the statute to be observed. *Brown,* 106 Cal.Rptr. at 103, 506 P.2d at 227. See Tussman and tenBroek, *The Equal Protection of the Laws,* 37 Cal.L.Rev. 341, 351–52

(1949) and Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus,* 10 UCLA L.Rev. 463 (1963). Erratic and fortuitous operation of a statute denied the requirements of equal protection, including citation of *Harvey,* 203 N.E.2d 573 and its rejection of a place classification as constitutionally discretionary. The court in *Brown,* 506 P.2d at 216–17 (emphasis in original) said:

> *A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."*

*See also American Bank & Trust Co. v. Community Hospital of Los Gatos–Saratoga, Inc.,* 104 Cal.App.3d 219, 163 Cal. Rptr. 513, 517 (1980). It is my persuasion that the authorities demonstrate that reasonable rationality as a test cannot be fulfilled where the determinant is accident of place.

The Florida judiciary in early progression to justice solved the problem of immunity at least in part by recision in *Hargrove v. Town of Cocoa Beach,* 96 So.2d 130, 132 (Fla.1957):

> Assuming that the immunity rule had its inception in the Men of Devon case, and most legal historians agree that it did, it should be noted that this case was decided in 1788, some twelve years after our Declaration of Independence. Be that as it may, our own feeling is that the courts should be alive to the demands of justice. We can see no necessity for insisting on legislative action in a matter which the courts themselves originated.
>
> The problem in Florida has become more confusing because of an effort to prune and pare the rule of immunity rather than to uproot it bodily and lay it aside as we should any other archaic and outmoded concept. This pruning approach has produced numerous strange and incongruous results.

Excluding the legislative or judicial function that might be exercised with immunity, that court held:

> Subject to the limitations above announced, we here merely hold that when an individual suffers a direct, personal injury proximately caused by the negligence of a municipal employee while acting within the scope of his employment, the injured individual is entitled to redress for the wrong done. To support the rule we hearken back to our original Florida precedent, *City of Tallahassee v. Fortune, supra* [3 Fla. 19 (1850)]. Our judicial forbears there held that where an individual suffers a special personal damage not common to the community but proximately resulting from the negligence of the municipal corporation acting through its employees, such individual is entitled to redress. We think this general rule was sound when it was announced in 1850 and it should be reestablished as the law of Florida. Within the framework of the above announced limitations this is the rule of our present opinion. In this vein, we therefore point out that instead of disregarding the rule of stare decisis, we now merely restore the original concepts of our jurisprudence to a position of priority in order to eradicate the deviations that have in our view detracted from the justice of the initial rule.

*Id.* at 133–34 (footnote omitted). *See also Thompson v. City of Jacksonville,* 130 So.2d 105 (Fla.App.1961), *cert. denied* 147 So.2d 530 (Fla.1962), limited later to exclude intentional torts of municipal employees.

Alabama likewise recognized the incongruity of a discriminatory denial of justice in *Chandler v. Hospital Authority of City of Huntsville,* 500 So.2d 1012 (Ala.1986) and *Peddycoart v. City of Birmingham,* 354 So.2d 808 (Ala.1978) to be even judicially unacceptable under the application of a rational basis standard. *See likewise, Jackson v. Mannesmann Demag Corp.,* 435 So.2d 725 (Ala.1983), court access. *See also Sweeney v. State,* 768 S.W.2d 253 (Tenn.1989), dangerous highway with notice and *City of Dallas v. Donovan,* 768 S.W.2d 905 (Tex.App.1989), missing stop signs and actual notice determinants of governmental liability. Case law in Mis-

souri affords scant support for this instant decision. The court in *Jones v. State Highway Commission,* 557 S.W.2d 225, 227 n. 1 (Mo.1977), as a comprehensive and well-reasoned opinion, abrogated sovereign immunity against tort liability and recognized by footnote that twenty-nine states and the District of Columbia had, by judicial decision to some degree, done the same.[14] That court reflected that "[o]ur duty is to respond to the claims which come before us in a manner consistent with the principles embedded in our constitution, statutes, and judicial precedents. This requires, on rare occasions, as it does today, that we reject an earlier rule." *Id.* at 227. As citing for earlier discussion on the nature of contemporary judicial processes, *Jones,* 557 S.W.2d at 227 n. 2 cites Day, *Why Judges Must Make Law,* 26 Case W.L.Rev. 563 (1976); Dworkin, *Hard Cases,* 88 Harv.L. Rev. 1057 (1975); and Hart, *Law in the Perspective of Philosophy: 1776–1976,* 51 N.Y.U.L.Rev. 538 (1976). Subsequent authority is suggested in *Winston v. Reorganized School Dist. R-2, Lawrence County, Miller, Mo.,* 636 S.W.2d 324 (Mo.1982) after the state legislature had adopted a tort claim code. Where immunity was expressly waived "as to tort claims arising from the *operation of motor vehicles* or from the condition of a *public entity's property,*" that law did not create the place discriminatory attribute here affixed by Chapter 89. *Id.* at 328 (emphasis in original).

That court recognized:

> Care can be taken in the selection and supervision of persons authorized to operate motor vehicles and detailed plans developed to control their use. Similar care may be exercised as to persons who maintain the public entities' property, and once on notice of a dangerous condition, remedial action may be undertaken to correct it.

*Id.* at 329.

The Arkansas court similarly considered governmental immunity for municipalities in *Parish v. Pitts,* 244 Ark. 1239, 429 S.W.2d 45 (1968) and abolished immunity except for conduct involving judgment or discretion or judicial or legislative activities. The legislature acted by reinstitution and a general immunity structure was enacted. *Hardin v. City of Devalls Bluff,* 256 Ark. 480, 508 S.W.2d 559 (1974); *Sullivan v. Pulaski County,* 247 Ark. 259, 445 S.W.2d 94 (1969). In Kentucky, a bill for a capped total for recovery for liability for a single incident was justified in *Com. v. Daniel,* 266 Ky. 285, 98 S.W.2d 897 (1936). A converse result as to a special bill is found in *Com. v. McCoun,* 313 S.W.2d 585 (Ky.1958), where a special bill was invalidated since a general statute had been enacted. The legislature had enacted a claims act code. *See University of Kentucky v. Guynn,* 372 S.W.2d 414 (Ky.1963).

In *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.1982), the supreme court abolished immunity perspectively by recognizing the judicial creation and beneficial judicial abrogation. Mississippi was then one of only six states without some action.

> For a good many years now, state after state has decided that the principle that the King [state] can do no wrong is not a legal principle that should receive a blanket application in modern times. There are many examples of the inequities involved in this principle. Under modern times, it is disadvantageous to both members of the public and members of the sovereign state. For the layman, an appropriate example would be where a conservation officer while on business for the state and operating an uninsured state vehicle, in the process of trying to apprehend a violator, and for some negligent reason, lost control of the state vehicle and injures an innocent person, both the injured person and the state employee are in deep trouble. All the state has to do is say, "we are the sover-

14. The thoughtful persuasion of an anticipatory dissent which presaged later developments is found in the consideration by Justice Finch in *O'Dell v. School Dist. of Independence,* 521 S.W.2d 403 (Mo.), *cert. denied* 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). He first discerned that the origination of the thesis of immunity was decisional, examined the reasons advanced for adaptation and dispositively eliminated retention justification. He remained on the court for the two years required to find his thesis adopted in *Jones,* 557 S.W.2d 225.

eign king and you do not have a claim for your injuries received through no fault of yours." Furthermore, the state employee is subject to a personal suit and the entire matter would have a great chance of ruining two persons, both the state employee and the innocent member of the public.

*Id.* at 1047. The legislature reacted by a general moratorium and partial remission where liability insurance was obtained with the moratorium to end on or after July 1, 1987 and the state in October 1, 1987 as political subdivisions. *See McFadden v. State*, 542 So.2d 871 (Miss.1989); *Region VII, Mental Health–Mental Retardation Center v. Isaac*, 523 So.2d 1013 (Miss.1988) and *Strait v. Pat Harrison Waterway Dist.*, 523 So.2d 36 (Miss.1988).

The Rhode Island court recognized that "[t]he immunization of municipal corporations from liability for the tortious conduct engaged in by their officers or servants during the performance of a governmental function has been repudiated repeatedly during the last decade." *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896, 899 (1970). That court then held that the immunity conferred by the courts was abrogated perspectively. The New Jersey Supreme Court similarly observed:

It is plainly unjust to refuse relief to persons injured by the wrongful conduct of the State. No one seems to defend that refusal as fair. There has been a steady movement away from immunity. In some jurisdictions, the change has been achieved by judicial decision, *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Stone v. Arizona Highway Comm.*, 93 Ariz. 384 381 P.2d 107 (1963), and in others by statutes which consented to suit in the courts or provided for relief before an administrative or legislative body.

*Willis v. Department of Conservation and Economic Development*, 55 N.J. 534, 264 A.2d 34, 36 (1970). In consequent action to comply with theory, immunity was eliminated without expression of "an ultimate doctrine." *See Frank Briscoe Co., Inc. v. Rutgers the State University and College of Medicine and Dentistry of New Jersey*, 130 N.J.Super. 493, 327 A.2d 687 (1974). Special legislation challenged the Connecticut court by consideration of equal protection constraints in voiding a Sunday closing blue law, *Caldor's, Inc. v. Bedding Barn, Inc.*, 177 Conn. 304, 417 A.2d 343 (1979), and then rejecting a discriminatory place law in *Ryszkiewicz v. City of New Britain*, 193 Conn. 589, 479 A.2d 793 (1984), which limited recovery for the torts of that city. The limitation did not apply to other municipalities of the state in citing with approval *Peddycoart*, 354 So.2d 808 and *Flax*, 596 P.2d 446. The place classification as differentiating towns could not be constitutionally justified.[15]

The Supreme Court of Indiana considered its immunity standard in a state contaminated beach injury case, *Perkins v. State*, 252 Ind. 549, 251 N.E.2d 30, 32–33 (1969):

There is no plain, unequivocal statement in the Constitution that the State of Indiana shall be immune against suits imposing a liability for damages; only an

15. The New Hampshire court had more trouble. In *Opinion of the Justices*, 101 N.H. 546, 134 A.2d 279 (1957), a special immunity for an individual airport authority was held to be constitutional. Following thereafter in *Merrill v. City of Manchester*, 114 N.H. 722, 332 A.2d 378 (1974), the judicially conferred immunity for cities and towns was abrogated except for legislative and judicial functions and executive and planning activities in the nature of exercised discretion. That immunity did not include the sovereign immunity absolution by the state itself. *Sousa v. State*, 115 N.H. 340, 341 A.2d 282 (1975). Responding to *Merrill*, the legislature had adopted a tort claims provision which was held to be constitutional in *Cargill's Estate v. City of Rochester*, 119 N.H. 661, 406 A.2d 704 (1979). A rational basis inquiry was the test adopted and the limitation on recovery as a dollar cap as a statutory limit excepted. In dissent in *Cargill's Estate*, 406 A.2d at 709 (emphasis in original), Justice Douglas reaffirmed that "[t]he legislature seems to be saying to our citizens that it values their persons *less* than it does their property or character." He found a patent violation of denied constitutional remedy for injuries to person, property or character. Surprisingly then in a reversal of thesis, the court in a 1980 case, *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980), invalidated as unconstitutional the litigative constraints of a comprehensive medical practice act.

inference might be drawn from the above section. As we read this section it occurs to us that the framers of the Constitution assumed that at common law the State was immune from suit and authorized the legislature to modify such liability to the extent it may see fit, providing that no private acts or special acts were passed for the benefit of some individual. We are dealing here not with a constitution prohibition, but rather with a principle of common law which has its roots in the ancient common law of England which held "The King can do no wrong" and hence could not be sued in any court of law. Blackstone's Commentaries on The Law, Gavit's Ed., p. 111.

* * * * * *

The common law changes. The principle of stare decisis should not always confine our thinking in any case. There has been within the last two or three decades considerable revaluation and consideration with reference to the principle of sovereign immunity.

Circumstances in bygone ages may have warranted some of the rather strict principles found in the common law relative to sovereign and charitable immunities. However, the common law of today is not a frozen mold of ancient ideas, but such law is active and dynamic and thus changes with the times and growth of society to meet its needs.

Oliver Wendell Holmes, in a discussion of early forms of liability in his "Common Law", pp. 36, 37, 1881 Ed., makes this statement with reference to its development:

> "* * * The truth is that the law is always approaching, and never reaching, consistency. It is forever adopting new principles from life at one end, and it always retains old ones from history at the other, which have not yet been absorbed or sloughed off. It will become entirely consistent only when it ceases to grow."

That court then held in quoting the California case of *People v. Superior Court of City and County of San Francisco,* 29 Cal.2d 754, 178 P.2d 1 (1947) that " '[w]here the state engages in industrial or business enterprises as distinguished from purely governmental activities, tort liability attaches.' " *Perkins,* 251 N.E.2d at 34–35. That court then left unanswered the comparable question of immunity for governmental actions and functions. *See however, Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585 (1980), where the medical malpractice act was constitutionally justified in providing limitations for recovery and diminution of the injured party's right to jury.

One of the leading cases addressing the national trend against continued immunity was authored for Illinois law in *Molitor v. Kaneland Community Unit Dist. No. 302,* 18 Ill.2d 11, 163 N.E.2d 89 (1959), *cert. denied* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960). In recognizing that the asserted basis of immunity, *Men of Devon,* 100 Eng.Rep. 359, had been overruled in England in 1890, the court surveyed government tort law for Illinois and recognized the dissatisfaction with continuation:

> As was stated by one court, "The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, * * *." * * * [C]ourts have overlooked the fact that the Revolutionary War was fought to abolish that "divine right of kings" on which the theory is based.

*Molitor,* 163 N.E.2d at 94 (quoting *Barker v. City of Santa Fe,* 47 N.M. 85, 136 P.2d 480, 482 (1943)).

The Illinois court recognized that providing responsibility for negligence, by abolishing immunity, would secure the public good by increasing safety:

As Dean Harno said: "A municipal corporation today is an active and virile creature capable of inflicting much harm. Its civil responsibility should be co-extensive. The municipal corporation looms up definitely and emphatically in our law, and what is more, it can and does commit wrongs. This being so, it must assume the responsibilities of the position it occupies in society." (Harno, Tort Immunity of Municipal Corporations, 4 Ill.L.Q. 28, 42.)

*Id.* 163 N.E.2d at 95–96. In reversing summary denial of relief by the trial court, the tribunal concluded "that the rule of school district tort immunity is unjust, unsupported by any valid reason, and has no rightful place in modern day society." *Id.* at 96.

A similar resolution followed for a park district immunity in *Harvey,* 203 N.E.2d 573. An irrational classification could not be justified for constitutional denial of the remedy for the injury negligently inflicted.

Many of the activities that frequently give rise to tort liability are common to all governmental units. The operation of automobiles is an obvious example. From the perspective of the injured party, or from the point of view of ability to insure against liability for negligent operation, there is no reason why one who is injured by a park district truck should be barred from recovery, while one who is injured by a city or village truck is allowed to recover, and one injured by a school district truck is allowed to recover only within a prescribed limit. And to the extent that recovery is permitted or denied on an arbitrary basis, a special privilege is granted in violation of section 22 of article IV.

*Id.* at 576. Furthermore, an improper pattern of discrimination based on the agency of responsibility is logically comparable to the place-defined-patchwork effect of Chapter 89. See the effect of insurance in *Sullivan v. Midlothian Park Dist.,* 51 Ill.2d 274, 281 N.E.2d 659 (1972). *See also* Baum, *Tort Liability of Local Governments and Their Employees: An Introduction to the Illinois Immunity Act,* 1966 U.Ill.L.F. 981 (1966).

Ohio became a principal state in immunity litigation as substantively pursued at an early date in *Raudabaugh v. State,* 96 Ohio St. 513, 118 N.E. 102 (1917). A constitutional clause fairly similar to the last sentence of Wyo. Const. art. 1, § 8, " '*Suits may be brought against the state, in such courts and in such manner, as may be provided by law,*' " was considered in determining whether or not the provision was self-executing in character. *Raudabaugh,* 118 N.E. at 102 (quoting Ohio Const. art. 1, § 16) (emphasis in original). The case held "that the provision of the Ohio Constitution * * * is not self-executing, and that legislative authority by statute is required as a prerequisite to the bringing of an action against the state in its own courts." *Id.* at 103. Despite a recognition of a "widespread criticism," the decision was restated in 1972 in the case of *Krause v. State,* 31 Ohio St.2d 132, 285 N.E.2d 736 (1972). A general elimination of immunity for the operation of motor vehicles as strained by exception of active duty operation for police and firemen was validated for constitutional classification in *Nanna v. Village of McArthur,* 44 Ohio App.2d 22, 335 N.E.2d 712 (1974).

Contrary to Indiana, provisions of the Ohio medical practice act were invalidated for improper classification on a constitutional perspective. The court held "[t]here is no satisfactory reason for this separate and unequal treatment" between medical malpractice litigation and other tort proceedings. *Graley v. Satayatham,* 343 N.E.2d 832, 837 (Ohio 1976). Furthermore, "[e]ven remaining within the area of the professions, it is notable that the special consideration given to the medical profession by these statutes is not given to lawyers or dentists or others who are subject to malpractice suits." *Id.* at 837. In *Haverlack v. Portage Homes, Inc.,* 2 Ohio St.3d 26, 442 N.E.2d 749 (1982), the court held that the abolition of immunity as applied to municipal corporations also abrogated the doctrine of governmental immunity for park districts. In *Marrek v. Cleveland Metroparks Bd. of Com'rs,* 9 Ohio St.3d 194, 459 N.E.2d 873 (1984), a differentiation

was established between exercise of a legislative or judicial function or the exercise of executive or planning function compared to negligence of employees in the performance of their activities. Failure to supervise a sledding area evoked conduct not protected by governmental immunity. However, a statutory immunity for all property owners under the circumstance was said to apply to the claimant as a recreational user. Consequently, the district did not owe a duty to the user to keep the premises safe for use. Citation of this authority for an immunity perspective is improvident. Related directly to Ohio law, an interesting comparison is provided by Howarth, *Sovereign Immunity—An Argument Pro,* 22 Clev.St.L.Rev. 48 (1973) and Sindell, *Sovereign Immunity—An Argument Con,* 22 Clev.St.L.Rev. 55 (1973). *See also* Murray and Murray, *The Unconstitutionality of Sovereign Immunity in Ohio—Last Stand for the Illegitimate King,* 18 U.Tol.L.Rev. 77, 77 (1986):

> Ohio courts have witnessed as long and fierce a battle over the doctrine of sovereign immunity as any courts in the nation. Victory has passed between the citizens and the government with the balance of sovereign power and individual rights dependent upon contemporary notions of justice.

*See* Note, *Interpreting the Tort Liability of the State of Ohio: Reynolds v. State,* 48 Ohio St.L.J. 577 (1987). *Hardy v. VerMeulen,* 32 Ohio St.3d 45, 512 N.E.2d 626 (1987), *cert. denied* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988) is persuasive in addressing medical malpractice statutory denial of a right to a remedy.

Another of the principal opinions rejecting continued validity for immunity was provided by *Spanel v. Mounds View School District No. 621,* 264 Minn. 279, 118 N.W.2d 795 (1962) by prospectively overruling the doctrine of immunity with respect to tort claims against school districts. Further attention concluded that a claim statute was discriminatory, *Glassmann v. Miller,* 356 N.W.2d 655 (Minn.1984), and denial of right of any recipient of worker's compensation was improper, *Bernthal v. City of St. Paul,* 376 N.W.2d 422 (Minn.1985). In *Bernthal,* the court considered two potentially identifiable purposes which may have fueled the enactment process: elimination of benefit to an insurance carrier and protection of the government entity from financial responsibility. However, the opinion went on to say:

> Assuming the two identified purposes of [the statute], are legitimate, the question remains whether the classification the statute creates permissibly furthers these purposes. To be constitutional, it must have been reasonable for the legislators to believe that use of the classification would promote the identified purposes. *Furthermore, the classification, even if it does further the purpose, cannot withstand rationality analysis if the classification is based upon "criteria wholly unrelated to the objective of" the statute.* *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). The classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).

*Id.* at 425–26 (emphasis added).

*Williams v. City of Detroit,* 364 Mich. 231, 111 N.W.2d 1 (1961) provided a similar anticipatory elimination of immunity on a closely divided vote.[16] *See* Cooperrider,

**16.** The concurring vote of Justice Black, which determined the case, affords an interesting perspective:

> When a court of last resort divides according to what the reading public looks upon as political lines, the lone writer of a separate or distinct opinion usually finds himself a sort of rogue in the eyes of his divisively lined up Brethren. He is supposed—so I twig—to join one team or the other; failing which the dainty vestments of delicate ostracism are primly cast upon him. * * *
>
> * * * * * *
>
> * * * "'Judges, like doctors and others, are reluctant to admit they made mistakes. *Then, too, there is plain old-fashioned animal laziness. It's a nuisance to revise what you have once settled.* Out of such laziness comes what Holmes called "one of the misfortunes of the law," that "ideas become encysted in phrases

*The Court, the Legislature, and Governmental Tort Liability in Michigan,* 72 Mich.L.Rev. 187 (1973).

Within the modernizing trend, the Nebraska court was first directed to municipal immunity:

> Particularly during the past 10 years, judicial opinions in increasing volume have pointed out the fact that the reasons underlying the traditional wide-sweeping rule of sovereign immunity have virtually disappeared in modern society. The rule is today no longer just, reasonable, nor defensible. The judicial attack on the traditional rule of governmental immunity has resulted in judicial abrogation of the doctrine in several states. [Citing cases from California, Illinois, Florida, New Jersey, Michigan, Wisconsin and Arizona.] See, also, Hink and Schulter, Some Thoughts on the American Law of Governmental Tort Liability, 20 Rutgers L.Rev. 710 (1966); A Comment on Government Tort Immunity in Kansas, 16 Kan.L.Rev. 265 (Jan.1968).
>
> The major conflict is no longer whether the traditional doctrine of governmental immunity from tort liability is obsolete and unjust, but, instead, lies in the area of the responsibility and power of the courts to reform it. For a discussion of the relative responsibility of courts and legislatures in this area, see, The Role of the Courts in Abolishing Governmental Immunity, Duke L.J. (1964), 888; Peck, The Role of the Courts and Legislatures in the Reform of Tort Law, 48 Minn.L.Rev. 265.
>
> * * * * * *
>
> "The dozen or so state supreme courts that have recently abrogated the immunity doctrine have recognized that an unjust and irrational principle cannot be allowed to persist on the hollow ground that changing an antiquated rule is a job for the legislature." 16 Kan.L.Rev. 265 at page 273.

*Brown,* 160 N.W.2d at 806–07.

That Nebraska court determined to proceed by action

> more effectively directed to a solution more narrowly limited to specific facts framed in litigated cases. Any modification ultimately shaped by this court should be limited to torts and should not be construed as imposing liability on any governmental body in the exercise of what might be termed "ministerial or discretionary functions" nor on the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions.

*Id.* at 808. That court then held that cities and other governmental subdivisions and local public bodies were not immune from tort liability arising out of the ownership use and operation of motor vehicles. *Brown* is followed by the university track meet accident of *Johnson v. Municipal University of Omaha,* 184 Neb. 512, 169 N.W.2d 286, 288 (1969):

> The issue of immunity and the issue of liability are two complete and distinct issues. The removal of governmental

and thereafter for a long time cease to provoke further analysis."' Courts On Trial, by Jerome Frank, Princeton University Press, 1950, pp. 272, 273."

* * * * * *

What indeed are judges to do as inexcusable injustice continues unremittingly before their very eyes; injustice occasioned by the over-protracted life of a rule made at common law by judges who knew naught of modern elevators and like appliances which, being negligently constructed or maintained by public authority, cause repetitious sufferings—as here—of totally innocent victims? Are judges powerless to act, as year after year goes by with primarily responsible legislators standing by, totally disinterested or politely amused at the plight of the courts?

The right answer is the same as given by life's teachings; teachings which are no stranger to the law. Action of any kind is always better than total inaction. Sins of cold-blooded omission invariably average out to greater error than sins of warm-hearted commission. As Dante tells us, the two will be weighed in different scales when the great day of Final Judgment arrives in our Highest Court.

*Williams,* 111 N.W.2d at 10–12 (emphasis in original). To see what happened thereafter for immunized police officer conduct, see *Anderson v. City of Detroit,* 54 Mich.App. 496, 221 N.W.2d 168 (1974).

immunity in a specified area of tort actions does not impose absolute liability in place of immunity. It only makes a governmental entity subject to the same rules which apply to nongovernmental persons or corporations who do not have the shield of sovereign governmental immunity. In the posture of the case before us, the demurrer to the petition can be sustained only if the doctrine of governmental immunity applies to this case in its full traditional sweep.

The court said no. *See* Comment, *The Doctrine of Governmental Immunity in Nebraska,* 1 Creighton L.Rev. 79 (1968).

In Iowa, the legislature intervened by passage of a general tort claims act in purpose perceived by the court:

> "We can only conclude the General Assembly saw no ultimate advantage to the state by continuing to cast upon some unfortunate individuals the full burden of damage done by the tortious conduct of state officers, agents or employees."

*Hubbard v. State,* 163 N.W.2d 904, 910 (Iowa 1969) (quoting *Graham v. Worthington,* 259 Iowa 845, 860–61, 146 N.W.2d 626, 636–37 (1966)). The Iowa act was an open-end tort claim act with stated immunity exceptions. *Lloyd v. State,* 251 N.W.2d 551 (Iowa 1977); *Saxton v. State,* 206 N.W.2d 85 (Iowa 1973).

Wisconsin moved from denied subrogation relief for car damage by applied immunity in *Firemen's Ins. Co. of Newark, N.J. v. Washburn County,* 2 Wis.2d 214, 85 N.W.2d 840 (1957),[17] to elimination of the immunity absolution in *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618 (1962).

> Another problem which we foresee regarding the scope of this decision is the determination of what public bodies are within the scope of the abrogation of the rule. The case at bar relates specifically to a city; however, we consider that abrogation of the doctrine applies to all public bodies within the state: the state, counties, cities, villages, towns, school districts, sewer districts, drainage districts, and any other political subdivisions of the state—whether they be incorporated or not. By reason of the rule of *respondeat superior* a public body shall be liable for damages for the torts of its officers, agents and employees occurring in the course of the business of such public body.
>
> So far as the state of Wisconsin and its various arms is concerned, *a careful distinction must be made between the abrogation of the immunity doctrine and the right of a private party to sue the state.*

*Holytz,* 115 N.W.2d at 625 (emphasis added).

No smooth pathway to justice for the negligently injured in Wisconsin was to be found as witnessed by the recognized sovereign immunity in *Cords v. State,* 62 Wis.2d 42, 214 N.W.2d 405 (1974), and the constitutionality of a liability cap in *Sambs v. City of Brookfield,* 97 Wis.2d 356, 293 N.W.2d 504, *cert. denied* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980) and *Stanhope v. Brown County,* 90 Wis.2d 823, 280 N.W.2d 711 (1979). Conversely, the coroner was not immunized from responsibility for fault without exercised discretion in *Scarpaci v. Milwaukee County,* 96 Wis.2d 663, 292 N.W.2d 816 (1980), and a public lake could unconstitutionally take according to *Zinn v. State,* 112 Wis.2d 417, 334 N.W.2d 67 (1983). Finally, the Milwaukee Brewer's baseball team merited review and protection from contended unconstitutional legislation which could permit an adjacent prison to be built. *Milwaukee Brewers*

17. This case included a statement as otherwise concepted in the character of injury case constitutional inquiries involving immunity "[v]ested property and contract rights stand in a very different category from inchoate remedies for acts which are not actionable at common law but are made so by statute." *Firemen's Ins. Co. of Newark, N.J.,* 85 N.W.2d at 846. This feudalistic perception values in constitutional terms only property and contract, but not integrity of the body or maintenance of the life. Like a generic acknowledgement today that hanging immunity adjudication on the peg of *Men of Devon* is neither justified in logic nor approved in social conscientiousness. Any application for approval of immunity to differentiating rights to body and life from property is at least outmoded in today's realities of the worth of a person.

*Baseball Club v. Wisconsin Dept. of Health and Social Services,* 130 Wis.2d 79, 387 N.W.2d 254 (1986). North Dakota found immunity and no arbitrary or indefensible classification among tort victims to differentiate by government agencies with or without insurance, *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982), but a medical malpractice act denied a quid pro quo for the classification which invaded constitutional protection and was consequently invalid in *Arneson v. Olson,* 270 N.W.2d 125 (N.D.1978). *See also Lyons v. Lederle Laboratories, A Div. of American Cyanamid Co.,* 440 N.W.2d 769 (S.D.1989).

Consequently, the demonstrated aversion of courts changed with delivery of justice to the denial concepts of immunity is nearly unanimous.

## IX. FAILURE OF CHAPTER 89 TO MEET THE CONSTITUTIONAL TESTS. IRRATIONALITY AT ITS WORST

It now becomes time unencumbered by the anachronism or illusions to medieval English kings to look at what Wyo. Const. art. 1, § 8 really says:

> All shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay. Suits may be brought against the state in such manner and in such courts as the legislature may by law direct.

That basic right is not quantified or qualified with sometimes or maybe limitations nor does that text expand the availability to legislative choice denying any rights when speaking only to the obligation to provide forum and process. I will also consider that the non-self-executing characterization as an ingredient of discussion in immunity cases as an outdated subject of dissertation cannot apply to special legislation which presently authorizes the denial of justice dependent upon where on public property the injury might occur.

The commonality of this character of crisis inspired immunity statute to the profusion of medical malpractice enactments provides persuasive logic for analysis of the modern direction of American law. *Hoem,* 756 P.2d 780 was not isolated in example reflecting a character of that constitutional law development. The statutes of repose creating a denial of constitutionally provided access to the courts is identically emplaced with a similarly created statutory bar to the injured as affected here by applied immunity.

In a singularly perceptive analysis, Note, *The Unconstitutionality of Medical Malpractice Statutes of Repose: Judicial Conscience Versus Legislative Will,* 34 Vill.L.Rev. 397 (1989), the author traces the current progress of constitutional law as the emerging trend to find such statutes to be unconstitutional. The author identifies an identical direction earlier achieved in the guest statute litigation. *See* Comment, *The Constitutionality of Automobile Guest Statutes: A Roadmap to the Recent Equal Protection Challenges,* 1975 B.Y.U.L.Rev. 99 (1975) and Comment, *The Common Law Basis of Automobile Guest Statutes,* 43 U.Chi.L.Rev. 798 (1976). Those pervasive statutes as then enacted as an outgrowth of the depression were for a long time satisfied by adjudicatory approval and are now almost unanimously rejected, including Wyoming. *Nehring,* 582 P.2d 67.

This newly understood constitutional interest of a right for access to the courts—right to a remedy provision—as accommodating due process and equal protection is now engineering the crescendo of cases invalidating dehabilitary statutes of repose. This brings to our attention a climactic redirection of the courts by a whole series of cases, many of which arise in states with the more modernized attention to a singularly emplaced immunity bar, which invalidate preclusive statutes of repose.[18]

18. *Kenyon,* 688 P.2d 961; *Austin v. Litvak,* 682 P.2d 41 (Colo.1984); *Phelan v. Hanft,* 471 So.2d 648 (Fla.App.1985), *appeal vacated* 488 So.2d 531 (Fla.1986); *Shessel v. Stroup,* 253 Ga. 56, 316 S.E.2d 155 (1984); *Clark v. Singer,* 250 Ga. 470, 298 S.E.2d 484 (1983); *Strahler v. St. Luke's Hosp.,* 706 S.W.2d 7 (Mo.1986); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); *Gaines v. Preterm–Cleveland, Inc.,* 33 Ohio St.3d 54, 514 N.E.2d 709 (1987); *Hardy,* 512 N.E.2d 626;

Obviously the medical malpractice injured claimant who was denied access to justice by passage of a statutory time before he knew that he was injured or a claim might exist is no different from the traveler negligently inflicted with injury by the public official and then denied access to the courts by the character of the perpetrator of that injury through this newly created applied immunity.

It may well be despite the equal protection, due process and rights to a jury constitutional provisions that the premier objection to enforcement of statutes such as Chapter 89 arise from denial of the constitutional access to the courts, which guaranty is enumerated for Wyoming by Wyo. Const. art. 1, § 8. Inevitably, if guest statutes join dodo birds and statutes of repose follow the passenger pigeon to extinction, unconstitutional prohibition of remedy by specialized immunity cannot indefinitely be maintained as either morally or legally justified.[19]

There should be a general system for justice that is generally followed instead of erratically and irrationally applied for pigeon-hole results. There should also be a predominating concept, if not foundation to every rationally constituted system of tort law, assuring recovery to the injured person where fault is found. How are Wyoming's citizens to understand the justice delivery system they are paying for? The state says it can injure them and whether or not they are compensated will depend on the good fortune of the place where they are (or are not) injured.

The singular concept that is now produced by statutory deletion of these remedies for injury recovery and this majority opinion in construction absolution is that property is valued in protection when destroyed or taken by government, but damaged body or destroyed life should be unprotected from negligence and fault of the agents of government. As a further disintegration of reasoned principle for recovery within the umbrella of assertable protection provided by the constitution, I urgently dissent. Not only does the result lack practical moralism in individual rights to protection from society, but historical justification and precedential realism cannot be persuasively applied to authenticate the result achieved. We should compare constitutional inquiry for the right to sell used cars as a property interest, *Roslindale Motor Sales, Inc. v. Police Com'r of Boston,* 405 Mass. 79, 538 N.E.2d 312 (1989), with protection for negligent injury to body or life itself evidenced here. It is not too different from the right to price competitively as the constitutional right or the size of a newspaper, but not sanctity of body and existence. *See Pirie v. Kamps,* 68 Wyo. 83, 229 P.2d 927 (1951), as well as

*Mominee v. Scherbarth,* 28 Ohio St.3d 270, 503 N.E.2d 717 (1986); *Reynolds v. Porter,* 760 P.2d 816 (Okl.1988); *Neagle v. Nelson,* 685 S.W.2d 11 (Tex.1985); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983); *Kohnke v. St. Paul Fire & Marine Ins. Co.,* 140 Wis.2d 80, 410 N.W.2d 585, *review granted* 141 Wis.2d 983, 416 N.W.2d 296 (1987), *aff'd on other grounds and remanded,* 144 Wis.2d 352, 424 N.W.2d 191 (Wis.1988). *See also Phillips v. ABC Builders, Inc.,* 611 P.2d 821 (Wyo.1980).

A statute of repose marks the boundary of a substantive right. A statute of limitation interposes itself only procedurally to bar the remedy after a substantive right has vested. *Reynolds,* 760 P.2d 816; Note, *supra,* 34 Vill.L.Rev. at 400. *Cf. Lyons,* 440 N.W.2d 769, unconstitutional statute of limitation for medical malpractice remedies.

**19.** An interesting analysis is made by the Ohio court in *Hardy,* 512 N.E.2d at 628 in first quoting the earlier case of *Kintz v. Harriger,* 99 Ohio St. 240, 124 N.E. 168, 170 (1919):

> "1. The Constitution of Ohio, Bill of Rights, Section 16, provides, among other things, 'Every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law.'
>
> "2. It is the primary duty of courts to sustain this declaration of right and remedy, wherever the same has been wrongfully invaded."

That court then considered the test for constitutionality:

> The right-to-a-remedy provision of Section 16, Article I does not require the analysis of rational-basis that is used to decide due process or equal protection arguments against the constitutionality of legislation. The fault in [the statute] is that it denies legal remedy to one who has suffered bodily injury. This the legislature may not do even if it acted with a rational basis.

*Hardy,* 512 N.E.2d at 629.

*Langley,* 84 P.2d 767 and *cf. Bulova Watch Co.,* 371 P.2d 409. *See also Quality Oil Co. v. E.I. du Pont De Nemours & Co.,* 182 Kan. 488, 322 P.2d 731 (1958). I cannot accommodate a degree of scrutiny to the right for recovery for injury to body or destruction of life with a lesser significance than acceptance of fair trade laws.

This present standard for invoking or waiving immunity according to the place of injury extends the boundaries of irrationality when used to deny rights to the citizens as the users of public facilities. On the streets and onto the parking lot across the sidewalk, government can inflict injury with immunity; but into the building, government is expelled from statism to reacquire responsibility like any other building owner.[20]

In assessing the creation of the 1986 immunities for government bodies in design, construction and maintenance of driveways and walkways, we need to reaffirm meaning to our constitution.

> **Equality of all.**
>
> In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.

Wyo. Const. art. 1, § 2.

> **Due process of law.**
>
> No person shall be deprived of life, liberty or property without due process of law.

Wyo. Const. art. 1, § 6.

> **No absolute, arbitrary power.**
>
> Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

Wyo. Const. art. 1, § 7.

> **Compensation for property taken.**
>
> Private property shall not be taken or damaged for public or private use without just compensation.

Wyo. Const. art. 1, § 33.

> **Uniform operation of general law.**
>
> All laws of a general nature shall have a uniform operation.

Wyo. Const. art. 1, § 34.

> **Special and local laws prohibited.**
>
> The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * for limitation of civil actions * * *. In all other cases where a general law can be made applicable no special law shall be enacted.

Wyo. Const. art. 3, § 27.

> **Damages for personal injuries or death not to be limited; workmen's compensation.**
>
> No law shall be enacted limiting the amount of damages to be recovered for causing the injury or death of any person.

Wyo. Const. art. 10, § 4.

Dealing as we are called to do in this appeal with the freedom of government and public employees to maim or kill its citizens by negligent misconduct upon roadways or walkways, I cannot fit the result to be achieved into the constitutional limitations opposed by this array of the Wyoming constitutional protection. As a universal principle, these provisions of the Wyoming Constitution limit the power of the legislature and no act of that body can be sustained which conflicts with them. *Atchison Street Ry. Co. v. Missouri Pac. Ry. Co.,* 31 Kan. 660, 3 P. 284, 286 (1884).

Likewise, as we said in *Hoem,* 756 P.2d 780, proper examination requires denial of this degree of near aimless venture of the legislature into denial of guarantees of its citizens. Victims of tortious injuries should be no less protected if caused by public employees than would be the victims of medical malpractice. No less than there, *Hoem,* 756 P.2d at 786, we again have strange bedfellows here, with directed interest to deny relief to those negligently injured. This enactment transgressed the Wyoming Constitution. *Id.* at 782. The really absurd result is now achieved. *Sto-*

20. A parking lot within a building does pose a problem. Compare W.S. 1-39-120, parking area exclusion from immunity, with W.S. 1-39-106, eliminating immunity from any building, recreational area or public park. Consequently directed also, a town has liability for the safety of its municipal buildings for the user, but not so for streets, alleys and parking lots.

*vall,* 648 P.2d at 548. Lacking the capacity applied there to construe to rationality, I conclude that the test of constitutionality is unachievable here.

The prayer of Justice Rose so forcefully stated in *Jivelekas,* 546 P.2d at 427–29 cannot be so casually discarded:

> In his writing against the age-old acceptance of the traditional mistakes of the law which he found moribund by the chains of legal doctrinaire, Justice Benjamin N. Cardozo said in "Law and Literature," published in 1931:
>
> > "The time is ripe for betterment. 'Le Droit a ses epoques,' says Pascal in words which Professor Hazeltine has recently recalled to us. The law has 'its epochs of ebb and flow.' One of the flood seasons is upon us. Men are insisting, as perhaps never before, that law shall be made true to its ideal of justice. Let us gather up the driftwood, and leave the waters pure."
>
> * * * * * *
>
> The judicial conscience must no longer permit us to tolerate a principle of human behavior which, out of hand, denies the injured, the maimed and the loved ones of the dead a right of action against wrongdoing just because the wrongdoer is a servant of the state or municipality. If the state and its entities are to expose the people and their property to negligent acts, then government must expect to respond to suit.

The anachronism of immunity as first created and maintained by the inertia of the judiciary, *Oroz,* 575 P.2d 1155, becomes no less unfair to the injured or killed when reinstated by a crisis directed legislature which gives scant heed to the rights of its citizens and voters for security from publicly imposed tortious harm.[21] Again, although the origin of the variant theories of immunity may have been " 'one of the mysteries of legal evolution,' " *Oroz,* 575 P.2d at 1158 (quoting Borchard, *Government Liability in Tort (parts 13),* 34 Yale L.Rev. 1, 4 (1924)), there should be no mistaking what the current emplacement does for access to justice in cases where those are unfortunately injured by the negligent acts of certain defined government employees who provide driveways and walkways for the public use. See for example, Recent Decision, *Tort Law—Governmental Liability for Injuries Caused by Open and Obvious Dangers,* 27 Ariz.L.Rev. 285 (1985).

I cannot accept handwringing for the negligently injured.

> Due to the persistence of the doctrine of sovereignty and its corollaries, and to the various judicial doctrines that have grown up in respect to the responsibility of the state and its officers, great injustice is done to many individuals in connection with the functioning of the modern state. Most of the difficulties that have arisen in the past could be avoided by the establishment of a proper ethical and legal basis for responsibility.

Blachly and Oatman, *supra,* 9 Law and Contemp.Probs. at 213.

It is not my perception nor do I say that no immunity for any governmental activity which endangers rights of citizens can ever be created. *Kaisner,* 543 So.2d 732. *Cf. McCracken v. City of Lawton,* 648 P.2d 18, 20 n. 3 (Okl.1982); *Hershel v. University*

**21.** We cannot, as judges, lawyers or citizens, give proper expression in our work to anarchistic concept of natural law for which we are unable to give a rational basis. D. Richards, *Toleration and the Constitution* at 7 (1986).

Where also tort law is applicable to business and general conduct, I would find the two goals of compensation of victims and deterrents of misconduct persuasively significant. Immunity and irresponsibility have an intrinsic character of commonality when directed to human behavior. Responsiveness and responsibility equally attend directed conduct. Calabresi, *Optimal Deterrence and Accidents,* 84 Yale L.J. 656 (1975).

The authors in Murray and Murray, *supra,* 18 U.Tol.L.Rev. at 122 (quoting *Marbury,* 5 U.S. at 163) (footnote omitted) appropriately concluded:

> The new sovereign immunity act alters merely the form of the question, not the conclusion. If it remains true that, as Chief Justice Marshall wrote, "[t]he very essence of civil liberty consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," civil liberties in a society which proclaims the people sovereign demands that the government stand accountable.

*Hospital Foundation,* 610 P.2d 237, 242 (Okl.1980) (Opala, J., specially concurring). Nevertheless, Chapter 89 cannot be pulled through constitutional guarantees to extricate out a valid legislative act. Practical problems of government do not require this kind of injustice accommodation. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, *reh'g denied* 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970). Nor can I find a distinction rationally drawn to address a legitimate purpose, *Western and Southern Life Ins. Co. v. State Bd. of Equalization of California,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), except to reduce rights of citizens for justice at an anticipated saving by absolved negligent conduct of government. No more fundamental interest can be perceived than freedom from unjustified negligent activity to damaging body or denying continued life. Certainly, neither a life insurance premium tax nor retirement age is intrinsic to maintenance of Wyoming's constitutional guarantees. Injury or loss of life is no less effacious whether resulting from simple negligence or gross misbehavior. *White,* 661 P.2d at 1275. Pain after injury cannot differentiate the intent of the perpetrators. *Cf. Lentz v. Morris,* 236 Va. 78, 372 S.E.2d 608 (1988). Justification is again not advanced by comparison or litigation resulting from congressional efforts to promote nuclear power. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), where a remedy is granted to provide due process and equal protection on the monstrous difference where no remedy will be provided for death or injury. Neither can absolution from liability and responsibility as provided by Chapter 89 be compared with the discretionary function immunity since differentiation between discretionary ministerial conduct has already been abolished by W.S. 1–39–102(b). *See Grant v. Davis,* 537 So.2d 7 (Ala.1988). *Cf. Denver Buick, Inc. v. Pearson,* 465 P.2d 512 (Wyo.1970), which distinguished the difference now abolished.

In equal protection and due process perspectives, attacks for justice may have usually failed where sovereign immunity was invoked if the claim sounded in tort except for the private bill disconsonance of constitutional application. Had the text of Chapter 89 been confined to issues of only sovereign immunity, then we would have this case confined to the irrationality special interest classification for applied immunity and a somewhat relatable thesis that original injustice may not be unconstitutional until eliminated and then reinstated by succeeding legislation. *Cf. O'Bannon,* 770 S.W.2d 215. This calls us to consider that even though the original injustice was unchallengeable, its reinstitution as reinstatement after elimination can be proscribed constitutionally. Tested is the question whether the socially absurd structure of injustice and denied rights when once forsaken by society can then be constitutionally restored to directly infect due process, equal protection and rights of access to the judicial system. An opposite view would almost believe that *Brown v. Board of Education,* might be written out of our collective knowledge and that the prior idiom of separate but equal restored to the social practice of this nation for education and existence.

In a broader context, we are called to recognize that Rasputin is not dead. Immunity's intrinsic invalidity, unjustified constitutionality, yet its political resiliency confounds rational analysis. *See* Comment, *The Doctrine of Sovereign Immunity in Wyoming: Current Status of the Doctrine and Arguments for Abrogation,* XX Land & Water L.Rev. 221 (1985). *See also* Borchard, *supra,* 34 Yale L.J. 1; Minge, *supra,* VII Land & Water L.Rev. at 229–62, 618–62; Comment, *Wyoming's Governmental Claims Act: Sovereign Immunity With Exceptions—A Statutory Analysis,* XV Land & Water L.Rev. 619 (1980); Note, *Sovereign Immunity of the State of Wyoming. Oroz v. Board of County Commissioners of Carbon County, 575 P.2d 1155 (Wyo.1978),* XIV Land & Water L.Rev. 271 (1979); and Note, *Sovereign Immunity—A Still Potent Concept in Wyoming,* 16 Wyo.L.J. 304 (1962).

The second problem is the irrationality of combining planning-design defects-discretionary and governmental decision making to accomplish a character of protected governmental activity from plain negligence in operation and maintenance of the facilities of society which cause injury to its citizens. Likewise, unjustified is failure to recognize the differing thesis invoked in comparisons between ministerial action and proprietary responsibility.

Perhaps the major problem now presented is the lack of logic and justification that attends a protected character of public activities for roadways, parking and sidewalks but not for buildings, recreation facilities, schools or the multitude of other activities within which government is the performer and the citizen is the user. I cannot rationalize the government retaining liability for vehicles on the roads but escaping liability for the roads upon which the vehicles ride. How all of that rationalization is justified despite the constitutional mandate escapes me. The broadened problem with Chapter 89 does not end with the state and sovereign immunity since the liability denial is charged to descend also to governmental immunity and the local units of government wherein past immunity may never have existed. If a road can be paved with uncompensated injury, a stopped sewer can also be plugged with immunization.

## X. PRIVATE BILLS

The salve to conscience that has in recent time been used by the Wyoming legislature to absolve injustice from operation of immunity has been by a private act, immunity waiver and appropriation, which is clearly unconstitutional. These enactments violate both the expressed limitations and the uniformity philosophy of this state's constitution. Cloe and Marcus, *Special and Local Legislation,* 24 Ky.L.J. 351 (1936). Nevertheless, this back door hand-out process has been used by the legislature four times as a recognition of the expertise of lobbying, willingness of most legislators to ignore special bill limitations imposed in the constitution and to avoid injustice created by the out-dated deterrent earlier created by the judiciary called immunity. It is unfortunate, as reflected in this record, that this unconstitutional approach is now suggested as an alternative to a uniform and fair adjudicatory system as a basis upon which this recreated immunity is justified in legislation.

It is improper to suggest that unconstitutional private bills as waiver and appropriation should continue to be used in the future rather than a rational and even-handed state plan encompassing a dissection of constitutional responsibility and morality by this eager effort to provide individualized justice for those persons fortunate enough to have the needed legislative contacts. With such a process, I cannot assent and will not now as in the past ever join. *See* 1975 Wyo.Sess.Laws. ch. 171, serious injury to an inmate at the Wyoming Industrial Institute in 1970, authorization $100,000; 1981 Wyo.Sess.Laws ch. 61, *Worthington,* 598 P.2d 796, highway construction site accident, appropriation $500,000; 1982 Wyo.Sess.Laws ch. 24, serious highway accident, appropriation $500,000 and waiver of immunity; and 1983 Wyo.Sess. Laws ch. 10, serious Wyoming highway accident, appropriation $250,000 and waiver of immunity.[22] See Wyo. Const. art. 1, § 34, uniform operation of general law; Wyo. Const. art. 3, § 27, special, local laws prohibited; and Wyo. Const. art. 3, § 36, prohibited appropriations.

The specific subject of private bills or special acts to remove immunity for one injured by an act of the governmental agent was directly addressed in *Rector v. State,* 495 P.2d 826, 827 (Okl.1972) (quoting Article V, Section 59, Okla. Const.), by analysis of a provision similar to the Wyoming Constitution:

> The trouble with private bills is similar to embezzlement. Once you first choose to do what is wrong, it becomes easier to continue to do it with regularity thereafter.

22. Only two legislators consistently voted "no" to these four back door immunity waiver legislative gambits; although generally speaking, most legislators recognized the constitutional irresponsibility in attempting to provide justice.

"Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted." [23]

The premier emplacement of a special law proscription came in *Nehring*, 582 P.2d 67, which invalidated Wyoming's forty-seven-year-old guest statute on the basis of its nature as special legislation after a dozen prior validating appellate decisions.

## XI. CONCLUSION

Negligence is an attribute of human conduct and accidents are inevitable. Justice deserves a standard in operation which will provide protection for Wyoming citizens. That standard announced by United States Supreme Court Justice John Marshall of right and remedy for body and life should not be overwhelmed by the level of anxiety which drove the legislature to pass Chapter 89.

Immunity is an outmoded anachronism of questional history and parentage. In this appeal, the majority applies an unjustifiably limited standard of review to an irrationally created disturbance of basic rights in justice for reparation for injury or death. This classification when listed constitutionally should never be given life in the injury or death to which it appertains. I refuse to lock out the injured at the courthouse door. *Daugaard v. Baltic Co-Op Bldg. Supply Ass'n*, 349 N.W.2d 419 (S.D.1984); *Hardy*, 512 N.E.2d 626. Our constitutional guarantees for access to the courts should not be converted into "useless appendage" at the whim of the legislature. *Berry By and Through Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985). Deferring to the legislature can only amount to abdication of our judicial duty to protect the rights guaranteed by the constitution of this state, "the source and limit of legislative as well as judicial power." *Nelson v. Krusen*, 678 S.W.2d 918, 923 (Tex.1984).

In finding that Chapter 89 invidiously demeans and pollutes Wyoming's constitutional rights for justice, I respectfully dissent.

23. *See also Lucero v. New Mexico State Highway Dept.*, 55 N.M. 157, 228 P.2d 945 (1951); *Jack v. State*, 183 Okl. 375, 82 P.2d 1033 (1937); and *Sirrine v. State*, 132 S.C. 241, 128 S.E. 172 (1925). *See also Keiderling v. Sanchez*, 91 N.M. 198, 572 P.2d 545 (1977); *Reynolds*, 760 P.2d 816; *Milwaukee Brewers Baseball Club*, 387 N.W.2d 254; *Soo Line R. Co. v. Department of Transp., Division of Highways*, 101 Wis.2d 64, 303 N.W.2d 626 (1981); and Cloe & Marcus, *supra*, 24 Ky.L.J. 351. *Compare, however*, Mai, *Constitutionality of Special Bills for Private Relief*, 6 Wyo.L.J. 261 (1952) and the moral obligation thesis of result-oriented decision, *State ex rel. McPherren v. Carter*, 30 Wyo. 22, 215 P. 477 (1923); and *State ex rel. Hanson v. Carter*, 30 Wyo. 43, 215 P. 484 (1923). *See also Phillips*, 611 P.2d 821 (Wyo.1980); *Washakie County School Dist. No. One*, 606 P.2d 310; *Mountain Fuel Supply Co. v. Emerson*, 578 P.2d 1351 (Wyo.1978); *Miller v. Board of County Commissioners of Natrona County*, 79 Wyo. 502, 337 P.2d 262 (1959); *Ludwig v. Harston*, 65 Wyo. 134, 197 P.2d 252 (1948); *May v. City of Laramie*, 58 Wyo. 240, 131 P.2d 300 (1942); *State v. LeBarron*, 24 Wyo. 519, 162 P. 265 (1917); and Note, *Limitation of Actions—Statute of Limitations for Architects and Builders as Special Legislation. Phillips v. ABC Builders, Inc., 611 P.2d 821 (Wyo.1980)*, XVI Land & Water L.Rev. 313 (1981).